METROMEDIA, INC., ET AL. *v.* CITY OF SAN DIEGO, ET AL.

No. 80–195.   Argued February 25, 1981—Decided July 2, 1981

WHITE, J., announced the judgment of the Court and delivered an opinion, in which STEWART, MARSHALL, and POWELL, JJ., joined. BRENNAN, J., filed an opinion concurring in the judgment, in which BLACKMUN, J., joined, *post*, p. 521. STEVENS, J., while concurring in Parts I–IV of the plurality opinion, filed an opinion dissenting from Parts V–VII of the plurality opinion and from the judgment, *post*, p. 540. BURGER, C. J., *post*, p. 555, and REHNQUIST, J., *post*, p. 569, filed dissenting opinions.

*Floyd Abrams* argued the cause for appellants. With him on the briefs were *Theodore B. Olson, Dean Ringel,* and *Wayne W. Smith.*

*C. Alan Sumption* argued the cause for appellees. With him on the brief was *John W. Witt.**

---

*Briefs of *amici curiae* urging reversal were filed by *Nadine Strossen* and *Bruce J. Ennis, Jr.,* for the American Civil Liberties Union; by *Arthur B. Hanson, Frank M. Northam,* and *Mitchell W. Dale* for the American Newspaper Publishers Association; by *Eric M. Rubin* for the Outdoor Advertising Association of America; by *Ronald A. Zumbrun, Thomas E. Hookano,* and *Raymond M. Momboisse* for the Pacific Legal Foundation; and by *Kip Pope* for Robert P. Pope et al.

Briefs of *amici curiae* urging affirmance were filed for the United States by *Solicitor General McCree, Assistant Attorney General Moorman, Deputy Solicitor General Claiborne, Edwin S. Kneedler, F. Kaid Benfield,* and *Edward J. Shawaker;* for the State of Hawaii et al. by *Wayne Minami,* Attorney General of Hawaii, and *Laurence Lau,* Deputy Attorney General, *Richard S. Cohen,* Attorney General of Maine, and *Cabanne Howard,* Assistant Attorney General, and *M. Jerome Diamond,* Attorney General of Vermont, and *Benson D. Scotch,* Assistant Attorney General; for the City of Alameda et al. by *Carter J. Stroud, David E. Schricker,* and *John Powers;* for the City and County of San Francisco by *George Agnost, Burk E. Delventhal, Diane L. Hermann,* and *Alice Suet Yee Barkley;* and for the National Institute of Municipal Law Officers by *Aaron A. Wilson, J. LaMar Shelley, Benjamin L. Brown, John Dekker, James B. Brennan, Henry W. Underhill, Jr., William R. Quinlan, George F. Knox, Jr., Max P. Zall, Allen G. Schwartz, Lee E. Holt, Burt Pines, Walter M. Powell, Roger F. Cutler, Conrad B. Mattox, Jr., Charles S. Rhyne,* and *William S. Rhyne.*

JUSTICE WHITE announced the judgment of the Court and delivered an opinion, in which JUSTICE STEWART, JUSTICE MARSHALL, and JUSTICE POWELL joined.

This case involves the validity of an ordinance of the city of San Diego, Cal., imposing substantial prohibitions on the erection of outdoor advertising displays within the city.

## I

Stating that its purpose was "to eliminate hazards to pedestrians and motorists brought about by distracting sign displays" and "to preserve and improve the appearance of the City," San Diego enacted an ordinance to prohibit "outdoor advertising display signs."[1] The California Supreme Court subsequently defined the term "advertising display sign" as "a rigidly assembled sign, display, or device permanently affixed to the ground or permanently attached to a building or other inherently permanent structure constituting, or used for the display of, a commercial or other advertisement to the public." 26 Cal. 3d 848, 856, n. 2, 610 P.

[1] San Diego Ordinance No. 10795 (New Series), enacted March 14, 1972. The general prohibition of the ordinance reads as follows:

"B. OFF-PREMISE OUTDOOR ADVERTISING DISPLAY SIGNS PROHIBITED

"Only those outdoor advertising display signs, hereinafter referred to as signs in this Division, which are either signs designating the name of the owner or occupant of the premises upon which such signs are placed, or identifying such premises; or signs advertising goods manufactured or produced or services rendered on the premises upon which such signs are placed shall be permitted. The following signs shall be prohibited:

"1. Any sign identifying a use, facility or service which is not located on the premises.

"2. Any sign identifying a product which is not produced, sold or manufactured on the premises.

"3. Any sign which advertises or otherwise directs attention to a product, service or activity, event, person, institution or business which may or may not be identified by a brand name and which occurs or is generally conducted, sold, manufactured, produced or offered elsewhere than on the premises where such sign is located."

2d 407, 410, n. 2 (1980). "Advertising displays signs" include any sign that "directs attention to a product, service or activity, event, person, institution or business." [2]

The ordinance provides two kinds of exceptions to the general prohibition: onsite signs and signs falling within 12 specified categories. Onsite signs are defined as those

> "designating the name of the owner or occupant of the premises upon which such signs are placed, or identifying such premises; or signs advertising goods manufactured or produced or services rendered on the premises upon which such signs are placed."

The specific categories exempted from the prohibition include: government signs; signs located at public bus stops; signs manufactured, transported, or stored within the city, if not used for advertising purposes; commemorative historical plaques; religious symbols; signs within shopping malls; for sale and for lease signs; signs on public and com-

---

[2] The California Supreme Court noted that the ordinance as written might be interpreted "to apply to signs of a character very different from commercial billboards—for example, to a picket sign announcing a labor dispute or a small sign placed in one's front yard proclaiming a political or religious message." 26 Cal. 3d, at 856, n. 2, 610 P. 2d, at 410, n. 2. For this reason the court adopted the narrowing definition (quoted in the text). That definition, however, focused on the structure not the content of the billboard: It excluded "picket signs" but not billboards used to convey a noncommercial message. Cf. *State ex rel. Dept. of Transportation* v. *Pile,* 603 P. 2d 337 (1979) (Oklahoma Supreme Court construed a state statute prohibiting outdoor advertising signs as not covering noncommercial speech in order to avoid constitutional problems). The court explicitly recognized this continuing burden on noncommercial speech: "The relatively few non-commercial advertisers who would be restricted by the San Diego ordinance . . . possess a great variety of alternative means of communication." 26 Cal. 3d, at 869, 610 P. 2d, at 418–419. Furthermore, the city continues to contend that the ordinance prohibits the use of billboards to convey a noncommercial message, unless that message falls within one of the specified exemptions contained in the ordinance. Brief for Appellees 6.

mercial vehicles; signs depicting time, temperature, and news; approved temporary, off-premises, subdivision directional signs; and "[t]emporary political campaign signs." [3] Under this scheme, onsite commercial advertising is per-

[3] Section 101.0700 (F) provides as follows:

"The following types of signs shall be exempt from the provisions of these regulations:

"1. Any sign erected and maintained pursuant to and in discharge of any governmental function or required by any law, ordinance or governmental regulation.

"2. Bench signs located at designated public transit bus stops; provided, however, that such signs shall have any necessary permits required by Sections 62.0501 and 62.0502 of this Code.

"3. Signs being manufactured, transported and/or stored within the City limits of the City of San Diego shall be exempt; provided, however, that such signs are not used, in any manner or form, for purposes of advertising at the place or places of manufacture or storage.

"4. Commemorative plaques of recognized historical societies and organizations.

"5. Religious symbols, legal holiday decorations and identification emblems of religious orders or historical societies.

"6. Signs located within malls, courts, arcades, porches, patios and similar areas where such signs are not visible from any point on the boundary of the premises.

"7. Signs designating the premises for sale, rent or lease; provided, however, that any such sign shall conform to all regulations of the particular zone in which it is located.

"8. Public service signs limited to the depiction of time, temperature or news; provided, however, that any such sign shall conform to all regulations of the particular zone in which it is located.

"9. Signs on vehicles regulated by the City that provide public transportation including, but not limited to, buses and taxicabs.

"10. Signs on licensed commercial vehicles, including trailers; provided, however, that such vehicles shall not be utilized as parked or stationary outdoor display signs.

"11. Temporary off-premise subdivision directional signs if permitted by a conditional use permit granted by the Zoning Administrator.

"12. Temporary political campaign signs, including their supporting structures, which are erected or maintained for no longer than 90 days and which are removed within 10 days after election to which they pertain."

mitted, but other commercial advertising and noncommercial communications using fixed-structure signs are everywhere forbidden unless permitted by one of the specified exceptions.

Appellants are companies that were engaged in the outdoor advertising business in San Diego at the time the ordinance was passed. Each owns a substantial number of outdoor advertising displays (approximately 500 to 800) within the city. These signs are all located in areas zoned for commercial and industrial purposes, most of them on property leased by the owners to appellants for the purpose of maintaining billboards. Each sign has a remaining useful income-producing life of over 25 years, and each sign has a fair market value of between $2,500 and $25,000. Space on the signs was made available to "all comers" and the copy on each sign changed regularly, usually monthly.[4] The nature of the outdoor advertising business was described by the parties as follows:

> "Outdoor advertising is customarily purchased on the basis of a presentation or campaign requiring multiple exposure. Usually a large number of signs in a variety of locations are utilized to communicate a particular advertiser's message. An advertiser will generally purchase a 'showing' which would involve the utilization of a specific number of signs advertising the same message in a variety of locations throughout a metropolitan area." [5]

Although the purchasers of advertising space on appellants' signs usually seek to convey a commercial message, their billboards have also been used to convey a broad range of noncommercial political and social messages.

---

[4] This account of appellants' businesses is taken from the joint stipulation of facts entered into by the parties and filed with their cross-motions for summary judgment in the California Superior Court. See Joint Stipulation of Facts Nos. 12–20, App. 44a–45a.

[5] Joint Stipulation of Facts No. 24, App. 47a.

Appellants brought suit in state court to enjoin enforcement of the ordinance. After extensive discovery, the parties filed a stipulation of facts, including:

"2. If enforced as written, Ordinance No. 10795 will eliminate the outdoor advertising business in the City of San Diego.

.          .          .          .          .

"28. Outdoor advertising increases the sales of products and produces numerous direct and indirect benefits to the public. Valuable commercial, political and social information is communicated to the public through the use of outdoor advertising. Many businesses and politicians and other persons rely upon outdoor advertising because other forms of advertising are insufficient, inappropriate and prohibitively expensive." Joint Stipulation of Facts Nos. 2, 28, App. 42a, 48a.

On cross-motions for summary judgment, the trial court held that the ordinance was an unconstitutional exercise of the city's police power and an abridgment of appellants' First Amendment rights. The California Court of Appeal affirmed on the first ground alone and did not reach the First Amendment argument. Without questioning any of the stipulated facts, including the fact that enforcement of the ordinance would "eliminate the outdoor advertising business in the City of San Diego," the California Supreme Court reversed. It held that the two purposes of the ordinance were within the city's legitimate interests and that the ordinance was "a proper application of municipal authority over zoning and land use for the purpose of promoting the public safety and welfare." 26 Cal. 3d, at 858, 610 P. 2d, at 411 (footnote omitted). The court rejected appellants' argument that the ordinance was facially invalid under the First Amendment. It relied on certain summary actions of this Court, dismissing for want of a substantial federal question appeals from several state-court decisions sustaining governmental restrictions

on outdoor sign displays.[6]  Appellants sought review in this Court, arguing that the ordinance was facially invalid on First Amendment grounds and that the city's threatened destruction of the outdoor advertising business was prohibited by the Due Process Clause of the Fourteenth Amendment. We noted probable jurisdiction.  449 U. S. 897.

## II

Early cases in this Court sustaining regulation of and prohibitions aimed at billboards did not involve First Amendment considerations.  See *Packer Corp.* v. *Utah,* 285 U. S. 105 (1932); *St. Louis Poster Advertising Co.* v. *St. Louis,* 249 U. S. 269 (1919); *Thomas Cusack Co.* v. *City of Chicago,* 242 U. S. 526 (1917).[7]  Since those decisions, we have not given plenary consideration to cases involving First Amendment challenges to statutes or ordinances limiting the use of billboards, preferring on several occasions summarily to affirm decisions sustaining state or local legislation directed at billboards.

*Suffolk Outdoor Advertising Co.* v. *Hulse,* 439 U. S. 808 (1978), involved a municipal ordinance that distinguished between offsite and onsite billboard advertising prohibiting the former and permitting the latter.  We summarily dismissed as not presenting a substantial federal question an appeal from a judgment sustaining the ordinance, thereby rejecting the submission, repeated in this case, that prohibit-

---

[6] *Suffolk Outdoor Advertising Co.* v. *Hulse,* 439 U. S. 808 (1978); *Newman Signs, Inc.* v. *Hjelle,* 440 U. S. 901 (1979); *Lotze* v. *Washington,* 444 U. S. 921 (1979).

[7] These cases primarily involved due process and equal protection challenges to municipal regulations directed at billboards.  The plaintiffs claimed that their method of advertising was improperly distinguished from other methods that were not similarly regulated and that the ordinances resulted in takings of property without due process.  The Court rejected these claims, holding that the regulation of billboards fell within the legitimate police powers of local government.

ing offsite commercial advertising violates the First Amendment. The definition of "billboard," however, was considerably narrower in *Suffolk* than it is here: "A sign which directs attention to a business, commodity, service, entertainment, or attraction sold, offered or existing elsewhere than upon the same lot where such sign is displayed." This definition did not sweep within its scope the broad range of noncommercial speech admittedly prohibited by the San Diego ordinance. Furthermore, the Southampton, N. Y., ordinance, unlike that in San Diego, contained a provision permitting the establishment of public information centers in which approved directional signs for businesses could be located. This Court has repeatedly stated that although summary dispositions are decisions on the merits, the decisions extend only to "the precise issues presented and necessarily decided by those actions." *Mandel* v. *Bradley,* 432 U. S. 173, 176 (1977); see also *Hicks* v. *Miranda,* 422 U. S. 332, 345, n. 14 (1975); *Edelman* v. *Jordan,* 415 U. S. 651, 671 (1974). Insofar as the San Diego ordinance is challenged on the ground that it prohibits noncommercial speech, the *Suffolk* case does not directly support the decision below.

The Court has summarily disposed of appeals from state-court decisions upholding state restrictions on billboards on several other occasions. *Markham Advertising Co.* v. *Washington,* 393 U. S. 316 (1969), and *Newman Signs, Inc.* v. *Hjelle,* 440 U. S. 901 (1979), both involved the facial validity of state billboard prohibitions that extended only to certain designated roadways or to areas zoned for certain uses. The statutes in both instances distinguished between onsite commercial billboards and offsite billboards within the protected areas. Our most recent summary action was *Lotze* v. *Washington,* 444 U. S. 921 (1979), which involved an "as applied" challenge to a Washington prohibition on offsite signs. In that case, appellants erected, on their own property, billboards expressing their political and social views. Although billboards conveying information relating to the commercial

use of the property would have been permitted, appellants' billboards were prohibited, and the state courts ordered their removal. We dismissed as not raising a substantial federal question an appeal from a judgment rejecting the First Amendment challenge to the statute.

Insofar as our holdings were pertinent, the California Supreme Court was quite right in relying on our summary decisions as authority for sustaining the San Diego ordinance against First Amendment attack. *Hicks* v. *Miranda, supra.* As we have pointed out, however, summary actions do not have the same authority in this Court as do decisions rendered after plenary consideration, *Illinois State Board of Elections* v. *Socialist Workers Party,* 440 U. S. 173, 180–181 (1979); *Edelman* v. *Jordan, supra,* at 671; see also *Fusari* v. *Steinberg,* 419 U. S. 379, 392 (1975) (BURGER, C. J., concurring). They do not present the same justification for declining to reconsider a prior decision as do decisions rendered after argument and with full opinion. "It is not at all unusual for the Court to find it appropriate to give full consideration to a question that has been the subject of previous summary action." *Washington* v. *Yakima Indian Nation,* 439 U. S. 463, 477, n. 20 (1979); see also *Tully* v. *Griffin, Inc.,* 429 U. S. 68, 74–75 (1976); *Usery* v. *Turner Elkhorn Mining Co.,* 428 U. S. 1, 14 (1976). Probable jurisdiction having been noted to consider the constitutionality of the San Diego ordinance, we proceed to do so.

## III

This Court has often faced the problem of applying the broad principles of the First Amendment to unique forums of expression. See, *e. g., Consolidated Edison Co.* v. *Public Service Comm'n,* 447 U. S. 530 (1980) (billing envelope inserts); *Carey* v. *Brown,* 447 U. S. 455 (1980) (picketing in residential areas); *Schaumburg* v. *Citizens for a Better Environment,* 444 U. S. 620 (1980) (door-to-door and on-street

solicitation); *Greer* v. *Spock,* 424 U. S. 828 (1976) (Army bases); *Erznoznik* v. *City of Jacksonville,* 422 U. S. 205 (1975) (outdoor movie theaters); *Lehman* v. *City of Shaker Heights,* 418 U. S. 298 (1974) (advertising space within city-owned transit system). Even a cursory reading of these opinions reveals that at times First Amendment values must yield to other societal interests. These cases support the cogency of Justice Jackson's remark in *Kovacs* v. *Cooper,* 336 U. S. 77, 97 (1949): Each method of communicating ideas is "a law unto itself" and that law must reflect the "differing natures, values, abuses and dangers" of each method.[8] We deal here with the law of billboards.

Billboards are a well-established medium of communication, used to convey a broad range of different kinds of messages.[9] As Justice Clark noted in his dissent below:

> "The outdoor sign or symbol is a venerable medium for expressing political, social and commercial ideas. From the poster or 'broadside' to the billboard, outdoor signs have played a prominent role throughout American history, rallying support for political and social causes." 26 Cal. 3d, at 888, 610 P. 2d, at 430–431.

---

[8] The uniqueness of each medium of expression has been a frequent refrain: See, *e. g., Southeastern Promotions, Ltd.* v. *Conrad,* 420 U. S. 546, 557 (1975) ("Each medium of expression . . . must be assessed for First Amendment purposes by standards suited to it, for each may present its own problems"); *FCC* v. *Pacifica Foundation,* 438 U. S. 726, 748 (1978) ("We have long recognized that each medium of expression presents special First Amendment problems"); *Joseph Burstyn, Inc.* v. *Wilson,* 343 U. S. 495, 503 (1952) ("Each method tends to present its own peculiar problems").

[9] For a description of the history of the use of outdoor advertising in this country and the use of billboards within that history, see F. Presbrey, The History and Development of Advertising 497–511 (1929); Tocker, Standardized Outdoor Advertising: History, Economics and Self-Regulation, in Outdoor Advertising: History and Regulation 11, 29 (J. Houck ed. 1969).

The record in this case indicates that besides the typical commercial uses, San Diego billboards have been used

> "to publicize the 'City in motion' campaign of the City of San Diego, to communicate messages from candidates for municipal, state and national offices, including candidates for judicial office, to propose marriage, to seek employment, to encourage the use of seat belts, to denounce the United Nations, to seek support for Prisoners of War and Missing in Action, to promote the United Crusade and a variety of other charitable and socially-related endeavors and to provide directions to the traveling public." [10]

But whatever its communicative function, the billboard remains a "large, immobile, and permanent structure which like other structures is subject to . . . regulation." *Id.*, at 870, 610 P. 2d, at 419. Moreover, because it is designed to stand out and apart from its surroundings, the billboard creates a unique set of problems for land-use planning and development.

Billboards, then, like other media of communication, combine communicative and noncommunicative aspects. As with other media, the government has legitimate interests in controlling the noncommunicative aspects of the medium, *Kovacs* v. *Cooper, supra,* but the First and Fourteenth Amendments foreclose a similar interest in controlling the communicative aspects. Because regulation of the noncommunicative aspects of a medium often impinges to some degree on the communicative aspects, it has been necessary for the courts to reconcile the government's regulatory interests with the individual's right to expression. " '[A] court may not escape the task of assessing the First Amendment interest at stake and weighing it against the public interest allegedly served by the regulation.' " *Linmark Associates, Inc.* v. *Willingboro,* 431 U. S. 85, 91 (1977), quoting *Bigelow* v.

---

[10] Joint Stipulation of Facts No. 23, App. 46a–47a.

*Virginia,* 421 U. S. 809, 826 (1975). Performance of this task requires a particularized inquiry into the nature of the conflicting interests at stake here, beginning with a precise appraisal of the character of the ordinance as it affects communication.

As construed by the California Supreme Court, the ordinance restricts the use of certain kinds of outdoor signs. That restriction is defined in two ways: first, by reference to the structural characteristics of the sign; second, by reference to the content, or message, of the sign. Thus, the regulation only applies to a "permanent structure constituting, or used for the display of, a commercial or other advertisement to the public." 26 Cal. 3d, at 856, n. 2, 610 P. 2d, at 410, n. 2. Within that class, the only permitted signs are those (1) identifying the premises on which the sign is located, or its owner or occupant, or advertising the goods produced or services rendered on such property and (2) those within one of the specified exemptions to the general prohibition, such as temporary political campaign signs. To determine if any billboard is prohibited by the ordinance, one must determine how it is constructed, where it is located, and what message it carries.

Thus, under the ordinance (1) a sign advertising goods or services available on the property where the sign is located is allowed; (2) a sign on a building or other property advertising goods or services produced or offered elsewhere is barred; (3) noncommercial advertising, unless within one of the specific exceptions, is everywhere prohibited. The occupant of property may advertise his own goods or services; he may not advertise the goods or services of others, nor may he display most noncommercial messages.

## IV

Appellants' principal submission is that enforcement of the ordinance will eliminate the outdoor advertising business in San Diego and that the First and Fourteenth Amendments

prohibit the elimination of this medium of communication. Appellants contend that the city may bar neither all offsite commercial signs nor all noncommercial advertisements and that even if it may bar the former, it may not bar the latter. Appellants may raise both arguments in their own right because, although the bulk of their business consists of offsite signs carrying commercial advertisements, their billboards also convey a substantial amount of noncommercial advertising.[11] Because our cases have consistently distinguished between the constitutional protection afforded commercial as

---

[11] The California Supreme Court suggested that appellants, owners of billboard businesses, did not have standing to raise the argument that billboards may, for some individuals or groups, be the only affordable method of communicating to a large audience. 26 Cal. 3d, at 869, n. 14, 610 P. 2d, at 419, n. 14. In so holding, the California court seems to have confused the category of "commercial speech" with the category of individuals who have a "commercial interest" in protected speech. We have held that the overbreadth doctrine, under which a party whose own activities are unprotected may challenge a statute by showing that it substantially abridges the First Amendment rights of parties not before the court, will not be applied in cases involving "commercial speech." *Bates* v. *State Bar of Arizona,* 433 U. S. 350, 381 (1977). However, we have never held that one with a "commercial interest" in speech also cannot challenge the facial validity of a statute on the grounds of its substantial infringement of the First Amendment interests of others. Were it otherwise, newspapers, radio stations, movie theaters and producers—often those with the highest interest and the largest stake in a First Amendment controversy—would not be able to challenge government limitations on speech as substantially overbroad. As the opinion in *Bates* observed, *id.,* at 363:

"[O]ur cases long have protected speech even though it is in the form of a paid advertisement, *Buckley* v. *Valeo,* 424 U. S. 1 (1976); *New York Times Co.* v. *Sullivan,* 376 U. S. 254 (1964); in a form that is sold for profit, *Smith* v. *California,* 361 U. S. 147 (1959); *Murdock* v. *Pennsylvania,* 319 U. S. 105 (1943); or in the form of a solicitation to pay or contribute money, *New York Times Co.* v. *Sullivan,· supra; Cantwell* v. *Connecticut,* 310 U. S. 296 (1940). If commercial speech is to be distinguished, it 'must be distinguished by its content.' 425 U. S., at 761."

See also *Virginia Pharmacy Board* v. *Virginia Citizens Consumer Council,* 425 U. S. 748, 761 (1976).

opposed to noncommercial speech, in evaluating appellants' contention we consider separately the effect of the ordinance on commercial and noncommercial speech.

The extension of First Amendment protections to purely commercial speech is a relatively recent development in First Amendment jurisprudence. Prior to 1975, purely commercial advertisements of services or goods for sale were considered to be outside the protection of the First Amendment. *Valentine* v. *Chrestensen,* 316 U. S. 52 (1942). That construction of the First Amendment was severely cut back in *Bigelow* v. *Virginia, supra.* In *Virginia Pharmacy Board* v. *Virginia Citizens Consumer Council,* 425 U. S. 748 (1976), we plainly held that speech proposing no more than a commercial transaction enjoys a substantial degree of First Amendment protection: A State may not completely suppress the dissemination of truthful information about an entirely lawful activity merely because it is fearful of that information's effect upon its disseminators and its recipients. That decision, however, did not equate commercial and noncommercial speech for First Amendment purposes; indeed, it expressly indicated the contrary. See *id.,* at 770–773, and n. 24. See also *id.,* at 779–781 (STEWART, J., concurring).[12]

---

[12] JUSTICE STEWART's comments in *Virginia Pharmacy Board* are worth quoting here:

"The Court's determination that commercial advertising of the kind at issue here is not 'wholly outside the protection of' the First Amendment indicates by its very phrasing that there are important differences between commercial price and product advertising, on the one hand, and ideological communication on the other. Ideological expression, be it oral, literary, pictorial, or theatrical, is integrally related to the exposition of thought— thought that may shape our concepts of the whole universe of man. Although such expression may convey factual information relevant to social and individual decisionmaking, it is protected by the Constitution, whether or not it contains factual representations and even if it includes inaccurate assertions of fact. . . .

"Commercial price and product advertising differs markedly from ideological expression because it is confined to the promotion of specific goods

Although the protection extended to commercial speech has continued to develop, commercial and noncommercial communications, in the context of the First Amendment, have been treated differently. *Bates* v. *State Bar of Arizona*, 433 U. S. 350 (1977), held that advertising by attorneys may not be subjected to blanket suppression and that the specific advertisement at issue there was constitutionally protected. However, we continued to observe the distinction between commercial and noncommercial speech, indicating that the former could be forbidden and regulated in situations where the latter could not be. *Id.*, at 379–381, 383–384. In *Ohralik* v. *Ohio State Bar Assn.*, 436 U. S. 447 (1978), the Court refused to invalidate on First Amendment grounds a lawyer's suspension from practice for face-to-face solicitation of business for pecuniary gain. In the course of doing so, we again recognized the common-sense and legal distinction between speech proposing a commercial transaction and other varieties of speech:

> "To require a parity of constitutional protection for commercial and noncommercial speech alike could invite dilution, simply by a leveling process, of the force of the Amendment's guarantee with respect to the latter kind of speech. Rather than subject the First Amendment to such a devitalization, we instead have afforded commercial speech a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values, while allowing modes of regulation that might be impermissible in the realm of noncommercial expression." *Id.*, at 456.

In *Young* v. *American Mini Theatres, Inc.*, 427 U. S. 50, 69,

---

or services. The First Amendment protects the advertisement because of the 'information of potential interest and value' conveyed, rather than because of any direct contribution to the interchange of ideas." *Id.*, at 779–780 (references and footnotes omitted).

n. 32 (1976), JUSTICE STEVENS stated that the difference between commercial price and product advertising and ideological communication permits regulation of the former "that the First Amendment would not tolerate with respect to the latter." See also *Linmark Associates, Inc.* v. *Willingboro,* 431 U. S., at 91–92, and *Friedman* v. *Rogers,* 440 U. S. 1, 8–10 (1979).

Finally, in *Central Hudson Gas & Electric Corp.* v. *Public Service Comm'n,* 447 U. S. 557 (1980), we held: "The Constitution . . . accords a lesser protection to commercial speech than to other constitutionally guaranteed expression. The protection available for a particular commercial expression turns on the nature both of the expression and of the governmental interests served by its regulation." *Id.,* at 562–563 (citation omitted). We then adopted a four-part test for determining the validity of government restrictions on commercial speech as distinguished from more fully protected speech. (1) The First Amendment protects commercial speech only if that speech concerns lawful activity and is not misleading. A restriction on otherwise protected commercial speech is valid only if it (2) seeks to implement a substantial governmental interest, (3) directly advances that interest, and (4) reaches no further than necessary to accomplish the given objective. *Id.,* at 563–566.

Appellants agree that the proper approach to be taken in determining the validity of the restrictions on commercial speech is that which was articulated in *Central Hudson,* but assert that the San Diego ordinance fails that test. We do not agree.

There can be little controversy over the application of the first, second, and fourth criteria. There is no suggestion that the commercial advertising at issue here involves unlawful activity or is misleading. Nor can there be substantial doubt that the twin goals that the ordinance seeks to further—traffic safety and the appearance of the city—are sub-

stantial governmental goals.[13]  It is far too late to contend otherwise with respect to either traffic safety, *Railway Express Agency, Inc.* v. *New York,* 336 U. S. 106 (1949), or esthetics, see *Penn Central Transportation Co.* v. *New York City,* 438 U. S. 104 (1978); *Village of Belle Terre* v. *Boraas,* 416 U. S. 1 (1974); *Berman* v. *Parker,* 348 U. S. 26, 33 (1954).  Similarly, we reject appellants' claim that the ordinance is broader than necessary and, therefore, fails the fourth part of the *Central Hudson* test.  If the city has a sufficient basis for believing that billboards are traffic hazards and are unattractive, then obviously the most direct and perhaps the only effective approach to solving the problems they create is to prohibit them.  The city has gone no further than necessary in seeking to meet its ends.  Indeed, it has stopped short of fully accomplishing its ends: It has not prohibited all billboards, but allows onsite advertising and some other specifically exempted signs.

The more serious question, then, concerns the third of the *Central Hudson* criteria: Does the ordinance "directly advance" governmental interests in traffic safety and in the appearance of the city?  It is asserted that the record is inadequate to show any connection between billboards and traffic safety.  The California Supreme Court noted the meager record on this point but held "as a matter of law that an ordinance which eliminates billboards designed to be viewed from streets and highways reasonably relates to traffic safety."  26 Cal. 3d, at 859, 610 P. 2d, at 412.  Noting that "[b]illboards are intended to, and undoubtedly do, divert a driver's attention from the roadway," *ibid.,* and that

---

[13] The California Supreme Court had held in *Varney & Green* v. *Williams,* 155 Cal. 318, 100 P. 867 (1909), that a municipal ordinance prohibiting all advertising billboards purely for esthetic reasons was an unconstitutional exercise of municipal police power.  The court specifically overruled *Varney* in upholding the San Diego ordinance at issue here.  California's current position is in accord with that of most other jurisdictions.  See n. 15, *infra.*

whether the "distracting effect contributes to traffic accidents invokes an issue of continuing controversy," *ibid.*, the California Supreme Court agreed with many other courts that a legislative judgment that billboards are traffic hazards is not manifestly unreasonable and should not be set aside. We likewise hesitate to disagree with the accumulated, common-sense judgments of local lawmakers and of the many reviewing courts that billboards are real and substantial hazards to traffic safety.[14] There is nothing here to suggest that these judgments are unreasonable. As we said in a different context, *Railway Express Agency, Inc.* v. *New York, supra,* at 109:

> "We would be trespassing on one of the most intensely local and specialized of all municipal problems if we held that this regulation had no relation to the traffic problem of New York City. It is the judgment of the local authorities that it does have such a relation. And nothing has been advanced which shows that to be palpably false."

---

[14] See *E. B. Elliott Advertising Co.* v. *Metropolitan Dade County,* 425 F. 2d 1141, 1152 (CA5 1970); *Markham Advertising Co.* v. *Washington,* 73 Wash. 2d 405, 420–421, 439 P. 2d 248, 258 (1968); *New York State Thruway Authority* v. *Ashley Motor Court, Inc.,* 10 N. Y. 2d 151, 155–156, 176 N. E. 2d 566, 568 (1961); *Ghaster Properties, Inc.* v. *Preston,* 176 Ohio St. 425, 438, 200 N. E. 2d 328, 337 (1964); *Newman Signs, Inc.* v. *Hjelle,* 268 N. W. 2d 741, 757 (N. D. 1978); *Lubbock Poster Co.* v. *City of Lubbock,* 569 S. W. 2d 935, 939 (Tex. Civ. App. 1978); *State* v. *Lotze,* 92 Wash. 2d 52, 59, 593 P. 2d 811, 814 (1979); *Inhabitants, Town of Boothbay* v. *National Advertising Co.,* 347 A. 2d 419, 422 (Me. 1975); *Stuckey's Stores, Inc.* v. *O'Cheskey,* 93 N. M. 312, 321, 600 P. 2d 258, 267 (1979); *In re Opinion of the Justices,* 103 N. H. 268, 270, 169 A. 2d 762, 764 (1961); *General Outdoor Advertising Co.* v. *Department of Public Works,* 289 Mass. 149, 180–181, 193 N. E. 799, 813–814 (1935). But see *John Donnelly & Sons* v. *Campbell,* 639 F. 2d 6, 11 (CA1 1980); *State ex rel. Dept. of Transportation* v. *Pile,* 603 P. 2d, at 343; *Metromedia, Inc.* v. *City of Des Plaines,* 26 Ill. App. 3d 942, 946, 326 N. E. 2d 59, 62 (1975).

We reach a similar result with respect to the second asserted justification for the ordinance—advancement of the city's esthetic interests. It is not speculative to recognize that billboards by their very nature, wherever located and however constructed, can be perceived as an "esthetic harm." [15] San Diego, like many States and other municipalities, has chosen to minimize the presence of such structures.[16] Such esthetic judgments are necessarily subjective, defying objective evaluation, and for that reason must be carefully scrutinized to determine if they are only a public rationalization of an impermissible purpose. But there is no claim in this case that San Diego has as an ulterior motive the suppression of speech, and the judgment involved here is not so unusual as to raise suspicions in itself.

It is nevertheless argued that the city denigrates its in-

[15] See *John Donnelly & Sons* v. *Campbell, supra,* at 11–12; *E. B. Elliott Advertising Co.* v. *Metropolitan Dade County, supra,* at 1152; *Newman Signs, Inc.* v. *Hjelle, supra,* at 757; *Markham Advertising Co.* v. *Washington, supra,* at 422–423, 439 P. 2d, at 259; *Stuckey's Stores, Inc.* v. *O'Cheskey, supra,* at 321, 600 P. 2d, at 267; *Suffolk Outdoor Advertising Co.* v. *Hulse,* 43 N. Y. 2d 483, 489, 373 N. E. 2d 263, 265 (1977); *John Donnelly & Sons, Inc.* v. *Outdoor Advertising Bd.,* 369 Mass. 206, 219, 339 N. E. 2d 709, 717 (1975); *Cromwell* v. *Ferrier,* 19 N. Y. 2d 263, 269, 225 N. E. 2d 749, 753 (1967); *State* v. *Diamond Motors, Inc.,* 50 Haw. 33, 35–36, 429 P. 2d 825, 827 (1967); *United Advertising Corp.* v. *Metuchen,* 42 N. J. 1, 6, 198 A. 2d 447, 449 (1964); *In re Opinion of the Justices, supra,* at 270–271, 169 A. 2d, at 764. But see *State ex rel. Dept. of Transportation* v. *Pile, supra,* at 342; *Sunad, Inc.* v. *Sarasota,* 122 So. 2d 611, 614–615 (Fla. 1960).

[16] The federal Highway Beautification Act of 1965, Pub. L. 89–285, 79 Stat. 1028, as amended, 23 U. S. C. § 131 (1976 ed. and Supp. III), requires that States eliminate billboards from areas adjacent to certain highways constructed with federal funds. The Federal Government also prohibits billboards on federal lands. 43 CFR § 2921.0–6 (a) (1980). Three States have enacted statewide bans on billboards. Maine, Me. Rev. Stat. Ann., Tit. 23, § 1901 *et seq.* (1980); Hawaii, Haw. Rev. Stat. § 264–71 *et seq.,* § 445–111 *et seq.* (1976); Vermont, Vt. Stat. Ann., Tit. 10, § 488 *et seq.* (1973).

terest in traffic safety and beauty and defeats its own case by permitting onsite advertising and other specified signs. Appellants question whether the distinction between onsite and offsite advertising on the same property is justifiable in terms of either esthetics or traffic safety. The ordinance permits the occupant of property to use billboards located on that property to advertise goods and services offered at that location; identical billboards, equally distracting and unattractive, that advertise goods or services available elsewhere are prohibited even if permitting the latter would not multiply the number of billboards. Despite the apparent incongruity, this argument has been rejected, at least implicitly, in all of the cases sustaining the distinction between offsite and onsite commercial advertising.[17] We agree with those cases and with our own decisions in *Suffolk Outdoor Advertising Co.* v. *Hulse,* 439 U. S. 808 (1978); *Markham Advertising Co.* v. *Washington,* 393 U. S. 316 (1969); and *Newman Signs, Inc.* v. *Hjelle,* 440 U. S. 901 (1979).

In the first place, whether onsite advertising is permitted or not, the prohibition of offsite advertising is directly related to the stated objectives of traffic safety and esthetics. This is not altered by the fact that the ordinance is under-inclusive because it permits onsite advertising. Second, the city may believe that offsite advertising, with its periodically changing content, presents a more acute problem than does onsite advertising. See *Railway Express,* 336 U. S., at 110.

---

[17] See *Howard* v. *State Department of Highways of Colorado,* 478 F. 2d 581 (CA10 1973); *John Donnelly & Sons* v. *Campbell, supra; John Donnelly & Sons, Inc.* v. *Outdoor Advertising Bd., supra; Donnelly Advertising Corp.* v. *City of Baltimore,* 279 Md. 660, 668, 370 A. 2d 1127, 1132 (1977); *Modjeska Sign Studios, Inc.* v. *Berle,* 43 N. Y. 2d 468, 373 N. E. 2d 255 (1977); *Suffolk Outdoor Advertising Co.* v. *Hulse, supra; Ghaster Properties, Inc.* v. *Preston, supra; Newman Signs, Inc.* v. *Hjelle, supra; United Advertising Corp.* v. *Borough of Raritan,* 11 N. J. 144, 93 A. 2d 362 (1952) (Brennan, J.); *United Advertising Corp.* v. *Metuchen, supra; Stuckey's Stores, Inc.* v. *O'Cheskey, supra.*

512

Third, San Diego has obviously chosen to value one kind of commercial speech—onsite advertising—more than another kind of commercial speech—offsite advertising. The ordinance reflects a decision by the city that the former interest, but not the latter, is stronger than the city's interests in traffic safety and esthetics. The city has decided that in a limited instance—onsite commercial advertising—its interests should yield. We do not reject that judgment. As we see it, the city could reasonably conclude that a commercial enterprise—as well as the interested public—has a stronger interest in identifying its place of business and advertising the products or services available there than it has in using or leasing its available space for the purpose of advertising commercial enterprises located elsewhere. See *Railway Express, supra,* at 116 (Jackson, J., concurring); *Bradley* v. *Public Utilities Comm'n,* 289 U. S. 92, 97 (1933). It does not follow from the fact that the city has concluded that some commercial interests outweigh its municipal interests in this context that it must give similar weight to all other commercial advertising. Thus, offsite commercial billboards may be prohibited while onsite commercial billboards are permitted.

The constitutional problem in this area requires resolution of the conflict between the city's land-use interests and the commercial interests of those seeking to purvey goods and services within the city. In light of the above analysis, we cannot conclude that the city has drawn an ordinance broader than is necessary to meet its interests, or that it fails directly to advance substantial government interests. In sum, insofar as it regulates commercial speech the San Diego ordinance meets the constitutional requirements of *Central Hudson, supra.*

V

It does not follow, however, that San Diego's general ban on signs carrying noncommercial advertising is also valid

under the First and Fourteenth Amendments. The fact that the city may value commercial messages relating to onsite goods and services more than it values commercial communications relating to offsite goods and services does not justify prohibiting an occupant from displaying its own ideas or those of others.

As indicated above, our recent commercial speech cases have consistently accorded noncommercial speech a greater degree of protection than commercial speech. San Diego effectively inverts this judgment, by affording a greater degree of protection to commercial than to noncommercial speech. There is a broad exception for onsite commercial advertisements, but there is no similar exception for noncommercial speech. The use of onsite billboards to carry commercial messages related to the commercial use of the premises is freely permitted, but the use of otherwise identical billboards to carry noncommercial messages is generally prohibited. The city does not explain how or why noncommercial billboards located in places where commercial billboards are permitted would be more threatening to safe driving or would detract more from the beauty of the city. Insofar as the city tolerates billboards at all, it cannot choose to limit their content to commercial messages; the city may not conclude that the communication of commercial information concerning goods and services connected with a particular site is of greater value than the communication of noncommercial messages.[18]

---

[18] In *John Donnelly & Sons* v. *Campbell,* 639 F. 2d 6 (1980), the Court of Appeals for the First Circuit considered a statewide limitation on billboards, which similarly afforded a greater degree of protection to commercial than to noncommercial messages. That court took a position very similar to the one that we take today: it sustained the regulation insofar as it restricted commercial advertising, but held unconstitutional its more intrusive restrictions on noncommercial speech. The court stated: "The law thus impacts more heavily on ideological than on commercial speech—a peculiar inversion of First Amendment values. The statute . . . provides

Furthermore, the ordinance contains exceptions that permit various kinds of noncommercial signs, whether on property where goods and services are offered or not, that would otherwise be within the general ban. A fixed sign may be used to identify any piece of property and its owner. Any piece of property may carry or display religious symbols, commemorative plaques of recognized historical societies and organizations, signs carrying news items or telling the time or temperature, signs erected in discharge of any governmental function, or temporary political campaign signs.[19] No other noncommercial or ideological signs meeting the structural definition are permitted, regardless of their effect on traffic safety or esthetics.

Although the city may distinguish between the relative value of different categories of commercial speech, the city does not have the same range of choice in the area of noncommercial speech to evaluate the strength of, or distinguish between, various communicative interests. See *Carey* v. *Brown,* 447 U. S., at 462; *Police Dept. of Chicago* v. *Mosley,*

---

greater restrictions—and fewer alternatives, the other side of the coin—for ideological than for commercial speech . . . . In short, the statute's impositions are both legally and practically the most burdensome on ideological speech, where they should be the least." 639 F. 2d, at 15–16. Other courts, however, have failed to give adequate weight to the distinction between commercial and noncommercial speech and to the higher level of protection to be afforded the latter. See *Donnelly Advertising Corp.* v. *City of Baltimore,* 279 Md. 660, 370 A. 2d 1127 (1977); *State* v. *Lotze,* 92 Wash. 2d 52, 593 P. 2d 811 (1979). To the extent that this decision is not consistent with the conclusion reached in *Lotze,* we overrule our prior summary approval of that decision in 444 U. S. 921 (1979).

[19] In this sense, this case presents the opposite situation from that in *Lehman* v. *City of Shaker Heights,* 418 U. S. 298 (1974), and *Greer* v. *Spock,* 424 U. S. 828 (1976). In both of those cases a government agency had chosen to prohibit from a certain forum speech relating to political campaigns, while other kinds of speech were permitted. In both cases this Court upheld the prohibition, but both cases turned on unique fact situations involving government-created forums and have no application here.

408 U. S. 92, 96 (1972). With respect to noncommercial speech, the city may not choose the appropriate subjects for public discourse: "To allow a government the choice of permissible subjects for public debate would be to allow that government control over the search for political truth." *Consolidated Edison Co.*, 447 U. S., at 538. Because some noncommercial messages may be conveyed on billboards throughout the commercial and industrial zones, San Diego must similarly allow billboards conveying other noncommercial messages throughout those zones.[20]

Finally, we reject appellees' suggestion that the ordinance may be appropriately characterized as a reasonable "time, place, and manner" restriction. The ordinance does not gen-

---

[20] Because a total prohibition of outdoor advertising is not before us, we do not indicate whether such a ban would be consistent with the First Amendment. But see *Schad* v. *Mount Ephraim*, 452 U. S. 61 (1981), on the constitutional problems created by a total prohibition of a particular expressive forum, live entertainment in that case. Despite JUSTICE STEVENS' insistence to the contrary, *post*, at 540, 541, and 548, n. 16, we do not imply that the ordinance is unconstitutional *because* it "does not abridge enough speech."

Similarly, we need not reach any decision in this case as to the constitutionality of the federal Highway Beautification Act of 1965. That Act, like the San Diego ordinance, permits onsite commercial billboards in areas in which it does not permit billboards with noncommercial messages. 23 U. S. C. § 131 (c) (1976 ed., Supp. III). However, unlike the San Diego ordinance, which prohibits billboards conveying noncommercial messages throughout the city, the federal law does not contain a total prohibition of such billboards in areas adjacent to the interstate and primary highway systems. As far as the Federal Government is concerned, such billboards are permitted adjacent to the highways in areas zoned industrial or commercial under state law or in unzoned commercial or industrial areas. 23 U. S. C. § 131 (d). Regulation of billboards in those areas is left primarily to the States. For this reason, the decision today does not determine the constitutionality of the federal statute. Whether, in fact, the distinction is constitutionally significant can only be determined on the basis of a record establishing the actual effect of the Act on billboards conveying noncommercial messages.

erally ban billboard advertising as an unacceptable "manner" of communicating information or ideas; rather, it permits various kinds of signs. Signs that are banned are banned everywhere and at all times. We have observed that time, place, and manner restrictions are permissible if "they are justified without reference to the content of the regulated speech, . . . serve a significant governmental interest, and . . . leave open ample alternative channels for communication of the information." *Virginia Pharmacy Board* v. *Virginia Citizens Consumer Council*, 425 U. S., at 771. Here, it cannot be assumed that "alternative channels" are available, for the parties stipulated to just the opposite: "Many businesses and politicians and other persons rely upon outdoor advertising because other forms of advertising are insufficient, inappropriate and prohibitively expensive." [21] A similar argument was made with respect to a prohibition on real estate "For Sale" signs in *Linmark Associates, Inc.* v. *Willingboro*, 431 U. S. 85 (1977), and what we said there is equally applicable here:

> "Although in theory sellers remain free to employ a number of different alternatives, in practice [certain products are] not marketed through leaflets, sound trucks, demonstrations, or the like. The options to which sellers realistically are relegated . . . involve more cost and less autonomy then . . . signs[,] . . . are less likely to reach persons not deliberately seeking sales information[,] . . . and may be less effective media for communicating the message that is conveyed by a . . . sign . . . . The alternatives, then, are far from satisfactory." *Id.*, at 93.

It is apparent as well that the ordinance distinguishes in several ways between permissible and impermissible signs at a particular location by reference to their content.

---

[21] See Joint Stipulation of Facts No. 28, App. 48a.

Whether or not these distinctions are themselves constitutional, they take the regulation out of the domain of time, place, and manner restrictions. See *Consolidated Edison Co. v. Public Service Comm'n, supra.*

## VI

Despite the rhetorical hyperbole of THE CHIEF JUSTICE's dissent, there is a considerable amount of common ground between the approach taken in this opinion and that suggested by his dissent. Both recognize that each medium of communication creates a unique set of First Amendment problems, both recognize that the city has a legitimate interest in regulating the noncommunicative aspects of a medium of expression, and both recognize that the proper judicial role is to conduct " 'a careful inquiry into the competing concerns of the State and the interests protected by the guarantee of free expression.' " *Post,* at 556. Our principal difference with his dissent is that it gives so little weight to the latter half of this inquiry.[22]

THE CHIEF JUSTICE writes that

> "[a]lthough we must ensure that any regulation of speech 'further[s] a sufficiently substantial government interest' . . . given a reasonable approach to a perceived problem, this Court's duty . . . is to determine whether the legislative approach is essentially neutral to the messages conveyed and leaves open other adequate means of conveying those messages." *Post,* at 561.[23]

---

[22] JUSTICE STEVENS' suggested standard seems to go even further than THE CHIEF JUSTICE in ignoring the private interests protected by the First Amendment. He suggests that regulation of speech is permissible so long as it is not biased in favor of a particular position and leaves open "ample" means of communication. *Post,* at 552. Nowhere does he suggest that the strength or weakness of the government's interests is a factor in the analysis.

[23] THE CHIEF JUSTICE correctly notes that traditional labels should not be substituted for analysis and, therefore, he correctly rejects any simple

Despite his belief that this is "the essence of . . . democracy," this has never been the approach of this Court when a legislative judgment is challenged as an unconstitutional infringement of First Amendment rights.[24]

By "essentially neutral," THE CHIEF JUSTICE may mean either or both of two things. He may mean that government restrictions on protected speech are permissible so long as the government does not favor one side over another on a subject of public controversy. This concept of neutrality was specifically rejected by the Court last Term in *Consolidated Edison Co.* v. *Public Service Comm'n,* 447 U. S., at 537. There, the Court dismissed the Commission's contention that a prohibition of all discussion, regardless of the viewpoint expressed, on controversial issues of public policy does not

---

classification of the San Diego ordinance as either a "prohibition" or a "time, place, and manner restriction." These "labels" or "categories," however, have played an important role in this Court's analysis of First Amendment problems in the past. The standard THE CHIEF JUSTICE himself adopts appears to be based almost exclusively on prior discussions of time, place, and manner restrictions. See *Heffron* v. *International Society for Krishna Consciousness, Inc.,* 452 U. S. 640 (1981); *Consolidated Edison Co.* v. *Public Service Comm'n,* 447 U. S. 530, 535 (1980); *California* v. *LaRue,* 409 U. S. 109, 117, n. 4 (1972); *Adderley* v. *Florida,* 385 U. S. 39 (1966); *Kovacs* v. *Cooper,* 336 U. S. 77 (1949). But this Court has never held that the less strict standard of review applied to time, place, and manner restrictions is appropriately used in every First Amendment case, or that it is the most that the First Amendment requires of government legislation which infringes on protected speech. If this were the case, there would be no need for the detailed inquiry this Court consistently pursues in order to answer the question of whether a challenged restriction is in fact a time, place, and manner restriction—the same standard of review would apply regardless of the outcome of that inquiry. As we demonstrated above, the San Diego ordinance is not such a restriction and there is, therefore, no excuse for applying a lower standard of First Amendment review to that ordinance.

[24] Nor has this Court ever accepted the view that it must defer to a legislative judgment that a particular medium of communication is "offensive" and "intrusive," merely because "other means [of communication] are available." *Post,* at 561.

unconstitutionally suppress freedom of speech. "The First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic." *Ibid.* On the other hand, THE CHIEF JUSTICE may mean by neutrality that government restrictions on speech cannot favor certain communicative contents over others. As a general rule, this, of course, is correct, see, *e. g., Police Dept. of Chicago* v. *Mosley,* 408 U. S. 92 (1972); *Carey* v. *Brown,* 447 U. S. 455 (1980). The general rule, in fact, is applicable to the facts of this case: San Diego has chosen to favor certain kinds of messages—such as onsite commercial advertising, and temporary political campaign advertisements—over others. Except to imply that the favored categories are for some reason *de minimis* in a constitutional sense, his dissent fails to explain why San Diego should not be held to have violated this concept of First Amendment neutrality.

Taken literally THE CHIEF JUSTICE's approach would require reversal of the many cases striking down antisolicitation statutes on First Amendment grounds: In each of them the city would argue that preventing distribution of leaflets rationally furthered the city's interest in limiting litter, applied to all kinds of leaflets and hence did not violate the principle of government neutrality, and left open alternative means of communication. See, *e. g., Martin* v. *Struthers,* 319 U. S. 141 (1943); *Schneider* v. *State,* 308 U. S. 147 (1939). Despite the dissent's assertion to the contrary, however, it has been this Court's consistent position that democracy stands on a stronger footing when courts protect First Amendment interests against legislative intrusion, rather than deferring to merely rational legislative judgments in this area:

> "Mere legislative preferences or beliefs respecting matters of public convenience may well support regulation directed at other personal activities, but be insufficient to justify such as diminishes the exercise of rights so

vital to the maintenance of democratic institutions. And so, as cases arise, the delicate and difficult task falls upon the courts to weigh the circumstances and to appraise the substantiality of the reasons advanced in support of the regulation of the free enjoyment of the rights." *Id.*, at 161.

Because THE CHIEF JUSTICE misconceives the nature of the judicial function in this situation, he misunderstands the significance of the city's extensive exceptions to its billboard prohibition. He characterizes these exceptions as "essentially negligible," *post,* at 562, and then opines that it borders on the frivolous to suggest that in "allowing such signs but forbidding noncommercial billboards, the city has infringed freedom of speech." *Post,* at 565. That, of course, is not the nature of this argument.

There can be no question that a prohibition on the erection of billboards infringes freedom of speech: The exceptions do not create the infringement, rather the general prohibition does. But the exceptions to the general prohibition are of great significance in assessing the strength of the city's interest in prohibiting billboards. We conclude that by allowing commercial establishments to use billboards to advertise the products and services they offer, the city necessarily has conceded that some communicative interests, *e. g.,* onsite commercial advertising, are stronger than its competing interests in esthetics and traffic safety. It has nevertheless banned all noncommercial signs except those specifically excepted.

THE CHIEF JUSTICE agrees that in allowing the exceptions to the rule the city has balanced the competing interests, but he argues that we transgress the judicial role by independently reviewing the relative values the city has assigned to various communicative interests. He seems to argue that although the Constitution affords a greater degree of protection to noncommercial than to commercial speech, a legisla-

ture need not make the same choices. *Post,* at 567. This position makes little sense even abstractly, and it surely is not consistent with our cases or with THE CHIEF JUSTICE's own argument that statutes challenged on First Amendment grounds must be evaluated in light of the unique facts and circumstances of the case. Governmental interests are only revealed and given concrete force by the steps taken to meet those interests. If the city has concluded that its official interests are not as strong as private interests in commercial communications, may it nevertheless claim that those same official interests outweigh private interests in noncommercial communications? Our answer, which is consistent with our cases, is in the negative.

## VII

Because the San Diego ordinance reaches too far into the realm of protected speech, we conclude that it is unconstitutional on its face.[25] The judgment of the California Supreme Court is reversed, and the case is remanded to that court.[26]

*It is so ordered.*

JUSTICE BRENNAN, with whom JUSTICE BLACKMUN joins, concurring in the judgment.

Believing that "a total prohibition of outdoor advertising is not before us," *ante,* at 515, n. 20, the plurality does not decide

---

[25] Appellants contend that the ordinance will effectively eliminate their businesses and that this violates the Due Process Clause. We do not know, however, what kind of ordinance, if any, San Diego will seek to enforce in place of that which we invalidate today. In any case, any question of unconstitutional "takings" aside, the Due Process Clause does not afford a greater degree of protection to appellants' business than does the First Amendment. Since we hold that the First Amendment interests in commercial speech are not sufficient to prevent the city from prohibiting offsite commercial advertisements, no different result should be reached under the Due Process Clause.

[26] Although the ordinance contains a severability clause, determining the meaning and application of that clause is properly the responsibility of the state courts. See *Dombrowski* v. *Pfister,* 380 U. S. 479, 497 (1965)

"whether such a ban would be consistent with the First Amendment," *ibid.* Instead, it concludes that San Diego may ban all billboards containing commercial speech messages without violating the First Amendment, thereby sending the signal to municipalities that bifurcated billboard regulations prohibiting commercial messages but allowing noncommercial messages would pass constitutional muster. *Ante,* at 521, n. 25. I write separately because I believe this case in effect presents the total ban question, and because I believe the plurality's bifurcated approach itself raises serious First Amendment problems and relies on a distinction between commercial and noncommercial speech unanticipated by our prior cases.

I

As construed by the California Supreme Court, a billboard subject to San Diego's regulation is "a rigidly assembled sign,

("The record suffices . . . to permit this Court to hold that, without the benefit of limiting construction, the statutory provisions on which the indictments are founded are void on their face; until an acceptable limiting construction is obtained, the provisions cannot be applied"); *Liggett Co.* v. *Lee,* 288 U. S. 517, 541 (1933) ("The operation of this [severability clause] consequent on our decision is a matter of state law. While we have jurisdiction of the issue, we deem it appropriate that we should leave the determination of the question to the state court"); *Dorchy* v. *Kansas,* 264 U. S. 286, 291 ("In cases coming from the state courts, this Court, in the absence of a controlling state decision may, in passing upon the claim under the federal law, decide, also, the question of severability. But it is not obliged to do so. The situation may be such as to make it appropriate to leave the determination of the question to the state court"). This rule is reflected in the different approaches this Court has taken to statutory construction of federal and state statutes infringing on protected speech. Compare *United States* v. *Thirty-seven Photographs,* 402 U. S. 363 (1971), with *Freedman* v. *Maryland,* 380 U. S. 51, 60 (1965). Since our judgment is based essentially on the inclusion of noncommercial speech within the prohibitions of the ordinance, the California courts may sustain the ordinance by limiting its reach to commercial speech, assuming the ordinance is susceptible to this treatment.

display, or device permanently affixed to the ground or permanently attached to a building or other inherently permanent structure constituting, or used for the display of, a commercial or other advertisement to the public." 26 Cal. 3d 848, 856, n. 2, 610 P. 2d 407, 410, n. 2 (1980), quoting Cal. Rev. & Tax. Code Ann. § 18090.2 (West Supp. 1970–1980).[1] San Diego's billboard regulation bans all commercial and noncommercial billboard advertising [2] with a few limited exceptions. The largest of these exceptions is for on-premises identification signs, defined as

> "signs designating the name of the owner or occupant of the premises upon which such signs are placed, or identifying such premises; or signs advertising goods manufactured or produced or services rendered on the premises upon which such signs are placed." App. to Juris. Statement 107a.

Other exceptions permit signs for governmental functions, signs on benches at bus stops, commemorative plaques for

---

[1] According to Joint Stipulation of Facts No. 25 entered into by the parties for purposes of cross-motions for summary judgment:

"Outdoor advertising is presented in two basic standardized forms. A 'poster panel' is a 12-foot by 24-foot sign on which a pre-printed message is posted, in sheets. A 'painted bulletin' is generally a 14-foot by 48-foot sign which contains a hand painted message. The message will remain in one place for a period of time, usually a month, and will then be disassembled and replaced by another message while the first message is moved to another sign. In this way, the same hand painted message will be moved throughout a metropolitan area over a six-month or twelve-month period." App. 47a.

The ordinance does not apply to such signs as "a picket sign announcing a labor dispute or a small sign placed in one's front yard proclaiming a political or religious message." 26 Cal. 3d 848, 856, n. 2, 610 P. 2d 407, 410, n. 2 (1980).

[2] I will sometimes refer to billboards containing commercial speech messages as "commercial billboards," and billboards containing noncommercial speech messages as "noncommercial billboards."

historical sites, religious symbol signs, for sale signs, time/ weather/news public service signs, and temporary political campaign signs erected for no longer than 90 days and removed within 10 days after the election to which they pertain. *Id.,* at 111a–112a; *ante,* at 495, n. 3.[3]

## II

Let me first state the common ground that I share with the plurality. The plurality and I agree that billboards are a medium of communication warranting First Amendment protection. The plurality observes that "[b]illboards are a well-established medium of communication, used to convey a broad range of different kinds of messages." *Ante,* at 501. See generally Tocker, Standardized Outdoor Advertising: History, Economics and Self-Regulation, in Outdoor Advertising: History and Regulation 11, 11–56 (J. Houck ed. 1969); F. Presbrey, The History and Development of Advertising 497–511 (1929). As the parties have stipulated, billboards in San Diego have been used

> "to advertise national and local products, goods and services, new products being introduced to the consuming public, to publicize the 'City in Motion' campaign of the City of San Diego, to communicate messages from candidates for municipal, state and national offices, including candidates for judicial office, to propose marriage, to seek employment, to encourage the use of seat belts, to denounce the United Nations, to seek support for Prisoners of War and Missing in Action, to promote the United Crusade and a variety of other charitable and

---

[3] Additional exceptions include signs manufactured, transported, or stored in San Diego so long as they are not used for advertising purposes; signs located within areas where such signs are not visible from the boundary of the premises; signs on vehicles such as buses and taxicabs; signs on other licensed commercial vehicles; and temporary off-premises subdivision directional signs. App. to Juris. Statement 111a–112a.

socially-related endeavors and to provide directions to the traveling public." Joint Stipulation of Facts No. 23, App. 46a–47a.[4]

Although there are alternative channels for communication of messages appearing on billboards, such as newspapers, television, and radio, these alternatives have never dissuaded active and continued use of billboards as a medium of expression and appear to be less satisfactory. See *Linmark Associates, Inc.* v. *Willingboro,* 431 U. S. 85, 93 (1977). Indeed the parties expressly stipulated that "[m]any businesses and politicians and other persons rely upon outdoor advertising because other forms of advertising are insufficient, inappropriate and prohibitively expensive." Joint Stipulation of Facts No. 28, App. 48a. Justice Black said it well when he stated the First Amendment's presumption that "all present instruments of communication, as well as others that inventive genius may bring into being, shall be free from governmental censorship or prohibition." *Kovacs* v. *Cooper,* 336 U. S. 77, 102 (1949) (dissenting opinion).

Where the plurality and I disagree is in the characterization of the San Diego ordinance and thus in the appropriate analytical framework to apply. The plurality believes that the question of a total ban is not presented in this case, *ante,* at 515, n. 20, because the ordinance contains exceptions to its general prohibition. In contrast, my view is that the *practical* effect of the San Diego ordinance is to eliminate the billboard as an effective medium of communication for the

---

[4] Perusal of the photographs of billboards included in the appendix to the jurisdictional statement filed in this Court reveals the wide range of noncommercial messages communicated through billboards, including the following: "Welcome to San Diego[:] Home of 1,100 Underpaid Cops"; "Support San Diego's No-Growth Policy[:] Spend Your Money in Los Angeles!"; "Voluntary Integration. Better Education By Choice"; "Support America's First Environment Strike. Don't Buy Shell!"; and "Get US out! of the United Nations."

speaker who wants to express the sorts of messages described in Joint Stipulation of Facts No. 23, and that the exceptions do not alter the overall character of the ban. Unlike the on-premises sign, the off-premises billboard "is, generally speaking, made available to 'all-comers', in a fashion similar to newspaper or broadcasting advertising. It is a forum for the communication of messages to the public." Joint Stipulation of Facts No. 22 (c), App. 46a.[5] Speakers in San Diego no longer have the opportunity to communicate their messages of general applicability to the public through billboards. None of the exceptions provides a practical alternative for the general commercial or noncommercial billboard advertiser. Indeed, unless the advertiser chooses to buy or lease premises in the city, or unless his message falls within one of the narrow exempted categories, he is foreclosed from announcing either commercial or noncommercial ideas through a billboard.

The characterization of the San Diego regulation as a total ban of a medium of communication has more than semantic implications, for it suggests a First Amendment analysis quite different from the plurality's. Instead of relying on the exceptions to the ban to invalidate the ordinance, I would apply the tests this Court has developed to analyze content-neutral

---

[5] Outdoor advertising traditionally has been classified into two categories: "on-premises" and "off-premises." One commentator describes:

"The on-premise classification of outdoor advertising is referred to as the sign industry, in that signs are custom-made and are manufactured by a sign contractor on premises *not* owned, leased or controlled by the sign contractor or his agent. Such signs are used primarily for the purpose of identifying a business, its products or its services at the point of manufacture, distribution or sale, hence on-premise.

.         .         .         .

"Off-premise advertising is an advertising service for others which erects and maintains outdoor advertising displays on premises owned, leased or controlled by the producer of the advertising service." Tocker, Standardized Outdoor Advertising: History, Economics and Self-Regulation, in Outdoor Advertising: History and Regulation 11, 15, 18 (J. Houck ed. 1969).

prohibitions of particular media of communication.[6] Most recently, in *Schad* v. *Mount Ephraim*, 452 U. S. 61 (1981), this Court assessed "the substantiality of the governmental interests asserted" and "whether those interests could be served by means that would be less intrusive on activity protected by the First Amendment," in striking down the borough's total ban on live commercial entertainment. *Id.*, at 70. *Schad* merely articulated an analysis applied in previous cases concerning total bans of media of expression. For example, in *Schneider* v. *State*, 308 U. S. 147 (1939), the Court struck down total bans on handbill leafletting because there were less restrictive alternatives to achieve the goal of prevention of litter, in fact alternatives that did not infringe at all on that important First Amendment privilege. *Id.*, at 162. In *Martin* v. *City of Struthers*, 319 U. S. 141 (1943), the Court invalidated a municipal ordinance that forbade persons from engaging in the time-honored activity of door-to-door solicitation. See also *Jamison* v. *Texas*, 318 U. S. 413, 416–417 (1943) (distribution of handbills); *Hague* v. *CIO*, 307 U. S. 496, 518 (1939) (opinion of Roberts, J.) (distribution of pamphlets). See generally Ely, Legislative and Administrative Motivation in Constitutional Law, 79 Yale L. J. 1205, 1335–1336 (1970).

Of course, as the plurality notes, "[e]ach method of communicating ideas is 'a law unto itself' and that law must reflect the 'differing natures, values, abuses and dangers' of each method." *Ante*, at 501, quoting *Kovacs* v. *Cooper, supra*, at 97 (Jackson, J., concurring). Similarly, in *Southeastern Promotions, Ltd.* v. *Conrad*, 420 U. S. 546, 557 (1975), this Court observed: "Each medium of expression, of course, must be assessed for First Amendment purposes by standards suited

---

[6] Different factors come into play when the challenged legislation is simply a time, place, or manner regulation rather than a total ban of a particular medium of expression.

to it, for each may present its own problems." It is obvious that billboards do present their own unique problems: they are large immobile structures that depend on eye-catching visibility for their value. At the same time, the special problems associated with billboards are not of a different genus than those associated with commercial live entertainment in the borough of Mount Ephraim, or with door-to-door literature distribution in the city of Struthers. In the case of billboards, I would hold that a city may totally ban them if it can show that a sufficiently substantial governmental interest is directly furthered by the total ban, and that any more narrowly drawn restriction, *i. e.,* anything less than a total ban, would promote less well the achievement of that goal.

Applying that test to the instant case, I would invalidate the San Diego ordinance. The city has failed to provide adequate justification for its substantial restriction on protected activity. See *Schad* v. *Mount Ephraim, supra,* at 72. First, although I have no quarrel with the substantiality of the city's interest in traffic safety, the city has failed to come forward with evidence demonstrating that billboards actually impair traffic safety in San Diego. Indeed, the joint stipulation of facts is completely silent on this issue. Although the plurality hesitates "to disagree with the accumulated, common-sense judgments of local lawmakers and of the many reviewing courts that billboards are real and substantial hazards to traffic safety," *ante,* at 509, I would not be so quick to accept legal conclusions in other cases as an adequate substitute for evidence *in this case* that banning billboards directly furthers traffic safety.[7] Moreover, the ordinance is not

[7] Not 1 of the 11 cases cited by the plurality in its footnote 14 stands for the proposition that reviewing courts have determined that "billboards are real and substantial hazards to traffic safety." These 11 cases merely apply the minimal scrutiny rational relationship test and the presumption of legislative validity to hold that it would not be *unreasonable* or *inconceivable* for a legislature or city government to conclude that billboards are

narrowly drawn to accomplish the traffic safety goal. Although it contains an exception for signs "not visible from any point on the boundary of the premises," App. to Juris.

traffic hazards. For example, in *New York State Thruway Authority* v. *Ashley Motor Court, Inc.,* 10 N. Y. 2d 151, 156, 176 N. E. 2d 566, 568 (1961), the court held:

"There are some, perhaps, who may dispute whether billboards and other advertising devices interfere with safe driving and constitute a traffic hazard . . . , but mere disagreement may not cast doubt on the statute's validity. Matters such as these are reserved for legislative judgment, and the legislative determination, here expressly announced, will not be disturbed unless manifestly unreasonable."

Only 5 of the 11 cases even discuss the First Amendment. See *Stuckey's Stores, Inc.* v. *O'Cheskey,* 93 N. M. 312, 600 P. 2d 258 (1979), appeal dism'd, 446 U. S. 930 (1980); *State* v. *Lotze,* 92 Wash. 2d 52, 593 P. 2d 811, appeal dism'd, 444 U. S. 921 (1979); *Lubbock Poster Co.* v. *City of Lubbock,* 569 S. W. 2d 935 (Tex. Civ. App. 1978), cert. denied, 444 U. S. 833 (1979); *Newman Signs, Inc.* v. *Hjelle,* 268 N. W. 2d 741 (N. D. 1978), appeal dism'd, 440 U. S. 901 (1979); *Markham Advertising Co.* v. *Washington,* 73 Wash. 2d 405, 439 P. 2d 248 (1968), appeal dism'd, 393 U. S. 316 (1969). Therefore, when the plurality states that "[t]here is nothing here to suggest that these judgments are unreasonable," *ante,* at 509, it is really saying that there is nothing unreasonable about other courts finding that there is nothing unreasonable about a legislative judgment. This is hardly a sufficient finding under the heightened scrutiny appropriate for this case. It is not surprising that, of the three cases cited in the plurality's footnote 14 that declined to accept the traffic safety rationale, two *were* decided under heightened scrutiny.

There is another reason why I would hesitate to accept the purported judgment of lawmakers that billboards are traffic hazards. Until recently, it was thought that aesthetics *alone* could never be a sufficient justification to support an exercise of the police power, and that aesthetics would have to be accompanied by a more traditional health, safety, morals, or welfare justification. Indeed, the California Supreme Court decision below explicitly repudiated the holding of a prior case, *Varney & Green* v. *Williams,* 155 Cal. 318, 100 P. 867 (1909), that held aesthetics to be an insufficient predicate for police power action. 26 Cal. 3d, at 860–861, 610 P. 2d, at 413. Therefore, in the case of billboard regulations, many cities may have used the justification of traffic safety in order to sustain ordinances where their true motivation was aesthetics. As the Hawaii Supreme Court com-

Statement 111a, billboards not visible from the street but nevertheless visible from the "boundary of the premises" are not exempted from the regulation's prohibition.

Second, I think that the city has failed to show that its asserted interest in aesthetics is sufficiently substantial in the commercial and industrial areas of San Diego. I do not doubt that "[i]t is within the power of the [city] to determine that the community should be beautiful," *Berman* v. *Parker,* 348 U. S. 26, 33 (1954), but that power may not be exercised in contravention of the First Amendment. This Court noted in *Schad* that "[t]he [city] has presented no evidence, and it is not immediately apparent as a matter of experience, that live entertainment poses problems . . . more significant than those associated with various permitted uses; nor does it appear that the [city] has arrived at a defensible conclusion that unusual problems are presented by live entertainment." 452 U. S., at 73. Substitute the word "billboards" for the words "live entertainment," and that sentence would equally apply to this case.

It is no doubt true that the appearance of certain areas of the city would be enhanced by the elimination of billboards, but "it is not immediately apparent as a matter of experience" that their elimination in all other areas as well would

mented in *State* v. *Diamond Motors, Inc.,* 50 Haw. 33, 36, 429 P. 2d 825, 827 (1967), in upholding a comprehensive sign ordinance:

"[The City's] answering brief admittedly 'does not extend to supporting the proposition that aesthetics alone is a proper objective for the exercise of the City's police power.' Perhaps, the 'weight of authority' in other jurisdictions persuaded the City to present the more traditional arguments because it felt that it was safer to do so. However, the brief of The Outdoor Circle as amicus curiae presents, as we think, a more modern and forthright position . . . .

". . . We are mindful of the reasoning of most courts that have upheld the validity of ordinances regulating outdoor advertising and of the need felt by them to find some basis in economics, health, safety, or even morality. . . . We do not feel so constrained." (Footnote omitted.)

See also C. Haar, Land-Use Planning 403–408 (3d ed. 1976).

have more than a negligible impact on aesthetics. See *John Donnelly & Sons* v. *Campbell,* 639 F. 2d 6, 23 (CA1 1980) (Pettine, J., concurring in judgment), summarily aff'd, *post,* p. 916.[8] The joint stipulation reveals that

> "[s]ome sections of the City of San Diego are scenic, some blighted, some containing strips of vehicle related commercial uses, some contain new and attractive office buildings, some functional industrial development and some areas contain older but useful commercial establishments." Joint Stipulation of Facts No. 8, App. 43a.

A billboard is not *necessarily* inconsistent with oil storage tanks, blighted areas, or strip development. Of course, it is not for a court to impose its own notion of beauty on San Diego. But before deferring to a city's judgment, a court must be convinced that the city is seriously and comprehensively addressing aesthetic concerns with respect to its environment. Here, San Diego has failed to demonstrate a comprehensive coordinated effort in its commercial and industrial areas to address other obvious contributors to an unattractive environment. In this sense the ordinance is underinclusive. See *Erznoznik* v. *City of Jacksonville,* 422 U. S. 205, 214 (1975). Of course, this is not to say that the city must address all aesthetic problems at the same time, or none at all. Indeed, from a planning point of view, attacking the problem

---

[8] Judge Pettine comments on Maine's statewide ban:

"Even assuming that a total ban on billboards will produce some aesthetic gain in all highway areas, the quantum of improvement will obviously vary with the site involved. In undeveloped areas, it may very well be that signs and billboards are the principal eyesores; here, the benefit will be great, for their removal would return the landscape to its pristine beauty. In industrial and commercial areas, however, signs and billboards are but one of countless types of manmade intrusions on the natural landscape. Without denying that some perceptible change for the better would occur even here, I question whether the margin of improvement obtained in these areas can really justify the state's decision to virtually eradicate commercial speech by sign and billboard." 639 F. 2d, at 23.

incrementally and sequentially may represent the most sensible solution. On the other hand, if billboards alone are banned and no further steps are contemplated or likely, the commitment of the city to improving its physical environment is placed in doubt. By showing a comprehensive commitment to making its physical environment in commercial and industrial areas more attractive,[9] and by allowing only narrowly tailored exceptions, if any,[10] San Diego could demon-

---

[9] For example, Williamsburg, Va., requires that any building newly constructed or altered in the city "shall have such design and character as not to detract from the value and general harmony of design of buildings already existing in the surrounding area in which the building is located or is to be located." Williamsburg City Code § 30–80 (1979).

[10] Appellants argue that the exceptions to the total ban, such as for on-premises signs, undercut the very goals of traffic safety and aesthetics that the city claims as paramount, and therefore invalidate the whole ordinance. Brief for Appellants 42–43. But obviously, a city can have special goals the accomplishment of which would conflict with the overall goals addressed by the total billboard ban. It would make little sense to say that a city has an all-or-nothing proposition—either ban all billboards or none at all. Because I conclude that the San Diego ordinance impermissibly infringes First Amendment rights in that the city has failed to justify the ordinance sufficiently in light of substantial governmental interests, I need not decide, as the plurality does in Part V of its opinion, whether the exceptions to the total ban constitute independent grounds for invalidating the regulation. However, if a city can justify a total ban, I would allow an exception only if it directly furthers an interest that is at least as important as the interest underlying the total ban, if the exception is no broader than necessary to advance the special goal, and if the exception is narrowly drawn so as to impinge as little as possible on the overall goal. To the extent that exceptions rely on content-based distinctions, they must be scrutinized with special care.

The San Diego billboard ordinance is a classic example of conflicting interests. In its section entitled "Purpose and Intent," the ordinance states:

"It is the purpose of these regulations to eliminate excessive and confusing sign displays which do not relate to the premises on which they are located; to eliminate hazards to pedestrians and motorists brought about by distracting sign displays; to ensure that signing is used as

strate that its interest in creating an aesthetically pleasing environment is genuine and substantial. This is a requirement where, as here, there is an infringement of important constitutional consequence.

I have little doubt that some jurisdictions will easily carry the burden of proving the substantiality of their interest in

---

identification and not as advertisement; and to preserve and improve the appearance of the City as a place in which to live and work.

"It is the intent of these regulations to protect an important aspect of the economic base of the City by preventing the destruction of the natural beauty and environment of the City, which is instrumental in attracting nonresidents who come to visit, trade, vacation or attend conventions; to safeguard and enhance property values; to protect public and private investment in buildings and open spaces; and to protect the public health, safety and general welfare." App. to Juris. Statement 106a–107a.

To achieve these purposes, the ordinance effects a general ban on billboards, but with an exception for on-premises identification signs. Of course, each on-premises sign detracts from achieving the city's goals of traffic safety and aesthetics, but contributes to the alternative goal of identification. In this way San Diego seeks to achieve the best compromise between the goals of traffic safety and aesthetics on the one hand, and convenience for the public on the other.

San Diego has shown itself fully capable of drafting narrow exceptions to the general ban. For example, the city has promulgated special regulations for sign control in the La Jolla sign control district:

"The Sign Control District is intended to maintain the unique, distinctive character and economic value of the La Jolla area in the City of San Diego and to regulate advertising of commercial enterprises . . . .

.          .          .          .          .

"One sign shall be permitted on each lot or parcel of real estate, . . . provided . . .:

.          .          .          .          .

"Such sign shall not exceed 5″ x 8″ in size and no part of such sign shall extend more than four feet above the surface of the ground upon which it is erected." *Id.*, at 113a–115a.

My views in this case make it unnecessary to decide the permissibility of the on-premises exception, but it is not inconceivable that San Diego could incorporate an exception to its overall ban to serve the identification interest without violating the Constitution. I also do not decide the validity of the other exceptions to the San Diego regulation.

aesthetics. For example, the parties acknowledge that a historical community such as Williamsburg, Va., should be able to prove that its interests in aesthetics and historical authenticity are sufficiently important that the First Amendment value attached to billboards must yield. See Tr. of Oral Arg. 22–25. And I would be surprised if the Federal Government had much trouble making the argument that billboards could be entirely banned in Yellowstone National Park, where their very existence would so obviously be inconsistent with the surrounding landscape. I express no view on whether San Diego or other large urban areas will be able to meet the burden.[11] See *Schad* v. *Mount Ephraim,* 452 U. S., at 77 (BLACKMUN, J., concurring). But San Diego failed to do so here, and for that reason I would strike down its ordinance.

## III

The plurality's treatment of the commercial-noncommercial distinction in this case is mistaken in its factual analysis of the San Diego ordinance, and departs from this Court's precedents. In Part IV of its opinion, the plurality concludes that the San Diego ordinance is constitutional insofar as it regulates commercial speech. Under its view, a city with merely a reasonable justification could pick and choose between those commercial billboards it would allow and those it would not, or could totally ban all commercial billboards.[12] In Part V,

---

[11] Likewise, I express no view on the constitutionality of the Highway Beautification Act of 1965, 23 U. S. C. § 131 (1976 ed. and Supp. III).

[12] The plurality comments that "the city *could reasonably conclude* that a commercial enterprise—as well as the interested public—has a stronger interest in identifying its place of business and advertising the products or services available there than it has in using or leasing its available space for the purpose of advertising commercial enterprises located elsewhere." *Ante,* at 512 (emphasis added). But *Central Hudson Gas & Electric Corp.* v. *Public Service Comm'n,* 447 U. S. 557 (1980), demands more than a rational basis for preferring one kind of commercial speech over another. Moreover, this case does not present legislation implicating the "common-

the plurality concludes, however, that the San Diego ordinance as a whole is unconstitutional because, *inter alia,* it affords a greater degree of protection to commercial than to noncommercial speech:

> "The use of onsite billboards to carry commercial messages related to the commercial use of the premises is freely permitted, but the use of otherwise identical billboards to carry noncommercial messages is generally prohibited. . . . Insofar as the city tolerates billboards at all, it cannot choose to limit their content to commercial messages; the city may not conclude that the communication of commercial information concerning goods and services connected with a particular site is of greater value than the communication of noncommercial messages." *Ante,* at 513.

The plurality apparently reads the onsite premises exception as limited solely to commercial speech. I find no such limitation in the ordinance. As noted *supra,* the onsite exception allows "signs designating the name of the owner or occupant of the premises upon which such signs are placed, or identifying such premises; or signs advertising goods manufactured or produced or services rendered on the premises upon which such signs are placed." App. to Juris. Statement 107a. As I read the ordinance, the content of the sign depends strictly on the identity of the owner or occupant of the premises. If the occupant is a commercial enterprise, the substance of a permissible identifying sign would be com-

---

sense differences" between commercial and noncommercial speech that " 'suggest that a different degree of protection is necessary to insure that the flow of truthful and legitimate commercial information is unimpaired.' " *Linmark Associates, Inc.* v. *Willingboro,* 431 U. S. 85, 98 (1977), quoting *Virginia Pharmacy Board* v. *Virginia Citizens Consumers Council, Inc.,* 425 U. S. 748, 771–772, n. 24 (1976). There is no suggestion that San Diego's billboard ordinance is designed to deal with "false or misleading signs." *Linmark Associates, Inc.* v. *Willingboro, supra,* at 98.

mercial. If the occupant is an enterprise usually associated with noncommercial speech, the substance of the identifying sign would be noncommercial. Just as a supermarket or barbershop could identify itself by name, so too could a political campaign headquarters or a public interest group. I would also presume that, if a barbershop could advertise haircuts, a political campaign headquarters could advertise "Vote for Brown," or "Vote for Proposition 13."

More importantly, I cannot agree with the plurality's view that an ordinance totally banning commercial billboards but allowing noncommercial billboards would be constitutional.[13] For me, such an ordinance raises First Amendment problems at least as serious as those raised by a total ban, for it gives city officials the right—before approving a billboard—to determine whether the proposed message is "commercial" or "noncommercial." Of course the plurality is correct when it observes that "our cases have consistently distinguished between the constitutional protection afforded commercial as opposed to noncommercial speech," *ante,* at 504–505, but it errs in assuming that a *governmental unit* may be put in the position in the first instance of deciding whether the proposed speech is commercial or noncommercial. In individual cases, this distinction is anything but clear. Because making such determinations would entail a substantial exercise of discretion by a city's official, it presents a real danger of curtailing

---

[13] Of course, as a matter of marketplace economics, such an ordinance may prove the undoing of *all* billboard advertising, both commercial and noncommercial. It may well be that no company would be able to make a profit maintaining billboards used solely for noncommercial messages. Although the record does not indicate how much of appellants' income is produced by noncommercial communicators, it would not be unreasonable to assume that the bulk of their customers advertise commercial messages. Therefore, noncommercial users may represent such a small percentage of the billboard business that it would be impossible to stay in business based upon their patronage alone. Therefore, the plurality's prescription may represent a *de facto* ban on both commercial and noncommercial billboards. This is another reason to analyze this case as a "total ban" case.

noncommercial speech in the guise of regulating commercial speech.

In *Cantwell* v. *Connecticut,* 310 U. S. 296 (1940), the Court reviewed a statute prohibiting solicitation of money by religious groups unless such solicitation was approved in advance by the Secretary of the Public Welfare Council. The statute provided in relevant part:

> "Upon application of any person in behalf of such [solicitation], the secretary shall determine whether such cause is a religious one . . . and conforms to reasonable standards of efficiency and integrity, and, if he shall so find, shall approve the same and issue to the authority in charge a certificate to that effect." *Id.,* at 302.

The Court held that conditioning the ability to solicit on a license, "the grant of which rests in the exercise of a determination by state authority as to what is a religious cause, is to lay a forbidden burden upon the exercise of liberty protected by the Constitution." *Id.,* at 307. Specifically rejecting the State's argument that arbitrary and capricious acts of a state officer would be subject to judicial review, the Court observed:

> "Upon [the state official's] decision as to the nature of the cause, the right to solicit funds depends. . . . [T]he availability of a judicial remedy for abuses in the system of licensing still leaves that system one of previous restraint which, in the field of free speech and press, we have held inadmissible." *Id.,* at 306.

See *Saia* v. *New York,* 334 U. S. 558, 560 (1948). As Justice Frankfurter subsequently characterized *Cantwell:* "To determine whether a cause is, or is not, 'religious' opens too wide a field of personal judgment to be left to the mere discretion of an official." 334 U. S., at 564 (dissenting opinion).

According such wide discretion to city officials to control the free exercise of First Amendment rights is precisely what

has consistently troubled this Court in a long line of cases starting with *Lovell* v. *Griffin,* 303 U. S. 444, 451 (1938). See, *e. g., Southeastern Promotions, Ltd.* v. *Conrad,* 420 U. S., at 552–553 (theatrical performance in city-owned auditorium); *Shuttlesworth* v. *Birmingham,* 394 U. S. 147, 150–153 (1969) (picketing and parading); *Staub* v. *City of Baxley,* 355 U. S. 313, 321–325 (1958) (solicitation); *Kunz* v. *New York,* 340 U. S. 290, 294 (1951) (public meetings); *Saia* v. *New York, supra,* at 560–562 (sound trucks); *Cantwell* v. *Connecticut, supra,* at 307 (solicitation); *Schneider* v. *State,* 308 U. S., at 163–164 (handbills); *Hague* v. *CIO,* 307 U. S., at 516 (handbills). See also *Young* v. *American Mini Theatres, Inc.,* 427 U. S. 50, 93 (1976) (BLACKMUN, J., dissenting); *Hynes* v. *Mayor and Council of Oradell,* 425 U. S. 610, 617 (1976); *Police Dept. of Chicago* v. *Mosley,* 408 U. S. 92, 97 (1972). The plurality's bifurcated approach, I fear, will generate billboard ordinances providing the grist for future additions to this list, for it creates discretion where none previously existed.

It is one thing for a court to classify in specific cases whether commercial or noncommercial speech is involved, but quite another—and for me dispositively so—for a city to do so regularly for the purpose of deciding what messages may be communicated by way of billboards. Cities are equipped to make traditional police power decisions, see *Saia* v. *New York, supra,* at 564–565 (Frankfurter, J., dissenting), not decisions based on the content of speech. I would be unhappy to see city officials dealing with the following series of billboards and deciding which ones to permit: the first billboard contains the message "Visit Joe's Ice Cream Shoppe"; the second, "Joe's Ice Cream Shoppe uses only the highest quality dairy products"; the third, "Because Joe thinks that dairy products are good for you, please shop at Joe's Shoppe"; and the fourth, "Joe says to support dairy price supports: they mean lower prices for you at his Shoppe." Or how about some San Diego Padres baseball fans—with no connection to

the team—who together rent a billboard and communicate the message "Support the San Diego Padres, a great baseball team." May the city decide that a United Automobile Workers billboard with the message "Be a patriot—do not buy Japanese-manufactured cars" is "commercial" and therefore forbid it? What if the same sign is placed by Chrysler? [14]

I do not read our recent line of commercial cases as authorizing this sort of regular and immediate line-drawing by governmental entities. If anything, our cases recognize the difficulty in making a determination that speech is either "commercial" or "noncommercial." In *Virginia Pharmacy Board* v. *Virginia Citizens Consumer Council, Inc.,* 425 U. S. 748, 764 (1976), after noting that "not all commercial messages contain . . . a very great public interest element," the Court suggested that "[t]here are few to which such an element, however, could not be added." The Court continued: "Our pharmacist, for example, could cast himself as a commentator on store-to-store disparities in drug prices, giving his own and those of a competitor as proof. We see little point in requiring him to do so, and little difference if he does not." *Id.,* at 764–765. Cf. *Murdock* v. *Pennsylvania,* 319 U. S. 105, 111 (1943). In *Bigelow* v. *Virginia,* 421 U. S. 809, 822 (1975), the Court observed that the advertisement of abortion services placed by a New York clinic in a Virginia weekly newspaper—although in part a commercial advertisement—was far more than that:

> "Viewed in its entirety, the advertisement conveyed information of potential interest and value to a diverse audience—not only to readers possibly in need of the services offered, but also to those with a general curi-

---

[14] These are not mere hypotheticals that can never occur. The Oil, Chemical and Atomic Workers International Union, AFL–CIO, actually placed a billboard advertisement stating: "Support America's First Environment Strike. Don't Buy Shell!" App. to Juris. Statement; see, n. 4, *supra.* What if Exxon had placed the advertisement? Could Shell respond in kind?

osity about, or genuine interest in, the subject matter or the law of another State and its development, and to readers seeking reform in Virginia. The mere existence of the Women's Pavilion in New York City, with the possibility of its being typical of other organizations there, and the availability of the services offered, were not unnewsworthy."

"The line between ideological and nonideological speech is impossible to draw with accuracy." *Lehman* v. *City of Shaker Heights,* 418 U. S. 298, 319 (1974) (BRENNAN, J., dissenting). I have no doubt that those who seek to convey commercial messages will engage in the most imaginative of exercises to place themselves within the safe haven of noncommercial speech, while at the same time conveying their commercial message. Encouraging such behavior can only make the job of city officials—who already are inclined to ban billboards—that much more difficult and potentially intrusive upon legitimate noncommercial expression.

Accordingly, I would reverse the decision of the California Supreme Court upholding the San Diego billboard ordinance.

JUSTICE STEVENS, dissenting in part.

If enforced as written, the ordinance at issue in this case will eliminate the outdoor advertising business in the city of San Diego.[1] The principal question presented is, therefore, whether a city may prohibit this medium of communication. Instead of answering that question, the plurality focuses its attention on the exceptions from the total ban and, somewhat ironically, concludes that the ordinance is an unconstitutional abridgment of speech because it does not abridge enough speech.[2]

---

[1] The parties so stipulated. See Joint Stipulation of Facts No. 2, App. 42a, quoted in n. 8, *infra.*

[2] That is the effect of both JUSTICE WHITE's reaction to the exceptions from a total ban and JUSTICE BRENNAN's concern about the city's attempt to differentiate between commercial and noncommercial messages, although

The plurality first holds that a total prohibition of the use of "outdoor advertising display signs" [3] for commercial messages, other than those identifying or promoting a business located on the same premises as the sign, is permissible. I agree with the conclusion that the constitutionality of this prohibition is not undercut by the distinction San Diego has drawn between onsite and offsite commercial signs, see *ante,* at 512 (plurality opinion), and I therefore join Parts I through IV of JUSTICE WHITE's opinion. I do not, however, agree with the reasoning which leads the plurality to invalidate the ordinance because San Diego failed to include a total ban on the use of billboards for both commercial and noncommercial messages. While leaving open the possibility that a total ban on billboards would be permissible, see *ante,* at 515, n. 20,[4] the plurality finds two flaws in the ordinance. First, because the ordinance permits commercial, but not noncommercial, use of onsite signs, it improperly "afford[s] a greater degree of protection to commercial than to noncommercial speech." *Ante,* at 513. And, second, because the ordinance excepts certain limited categories of noncommercial signs from the prohibition, the city is guilty of "choos[ing] the appropriate subjects for public discourse." *Ante,* at 515.

---

both of their conclusions purportedly rest on the character of the abridgment rather than simply its quantity.

[3] The ordinance does not define the term "outdoor advertising display signs." The California Supreme Court adopted the following definition to avoid overbreadth problems:

" '[A] rigidly assembled sign, display, or device permanently affixed to the ground or permanently attached to a building or other inherently permanent structure constituting, or used for the display of, a commercial or other advertisement to the public.' " 26 Cal. 3d 848, 856, n. 2, 610 P. 2d 407, 410, n. 2 (1980).

[4] As a practical matter, the plurality may well be approving a total ban on billboards, or at least on offsite billboards. For it seems unlikely that the outdoor advertising industry will be able to survive if its only customers are those persons and organizations who wish to use billboards to convey noncommercial messages. See *ante,* at 536, n. 13 (BRENNAN, J., concurring in judgment).

Although it is possible that some future applications of the San Diego ordinance may violate the First Amendment, I am satisfied that the ordinance survives the challenges that these appellants have standing to raise. Unlike the plurality, I do not believe that this case requires us to decide any question concerning the kind of signs a property owner may display on his own premises. I do, however, believe that it is necessary to confront the important question, reserved by the plurality, whether a city may entirely ban one medium of communication. My affirmative answer to that question leads me to the conclusion that the San Diego ordinance should be upheld; that conclusion is not affected by the content-neutral exceptions that are the principal subject of the debate between the plurality and THE CHIEF JUSTICE.

I

Appellants are engaged in the outdoor advertising business. The parties stipulated that there are critical differences between that business and so-called "onsite" or business signs.[5]

---

[5] The parties' stipulation described these differences:

"There is a difference between the outdoor advertising business and 'on-site' or business signs. On-site signs advertise businesses, goods or services available on the property on which the sign is located. On the other hand, the outdoor advertising businesses lease real property and erect signs thereon which are made available to national and local advertisers for commercial, political and social messages. Outdoor advertising is different from on-site advertising in that:

"(a) The outdoor advertising sign seldom advertises goods or services sold or made available on the premises on which the sign is located.

"(b) The outdoor advertising sign seldom advertises products or services sold or made available by the owner of the sign.

"(c) The outdoor advertising sign is, generally speaking, made available to 'all-comers', in a fashion similar to newspaper or broadcasting advertising. It is a forum for the communication of messages to the public.

"(d) The copy of the outdoor advertising sign changes, usually monthly. For example, a particular sign may advertise a local savings and loan association one month, a candidate for mayor the next month, the San Diego Zoo the third month, a new car the fourth month, and a union

Outdoor advertising is presented on large, standardized bill-boards which display a variety of commercial and noncommercial messages that change periodically.[6]  The only information in the record about onsite signs is that they "advertise businesses, goods or services available on the property on which the sign is located." Joint Stipulation of Facts No. 22, App. 45a.  There is no evidence that any onsite signs in San Diego of the permanent character covered by the ordinance[7] have ever been used for noncommercial messages.

If the ordinance is enforced, two consequences are predictable.  Appellants' large and profitable outdoor advertising businesses will be destroyed.[8]  Moreover, many persons who

---

grievance the fifth month." Joint Stipulation of Facts No. 22, App. 45a–46a.

The importance of the distinction between the outdoor advertising business in which appellants are engaged and the use of "onsite" signs is supported by the fact that the respective kinds of signs are produced by different manufacturers. See JUSTICE BRENNAN's opinion concurring in the judgment, *ante*, at 526, n. 5.

[6] The physical characteristics of outdoor advertising signs were established by stipulation:

"Outdoor advertising is presented in two basic standardized forms. A 'poster panel' is a 12-foot by 24-foot sign on which a pre-printed message is posted, in sheets. A 'painted bulletin' is generally a 14-foot by 48-foot sign which contains a hand painted message." Joint Stipulation of Facts No. 25, App. 47a.

[7] The California Supreme Court's narrowing construction of the ordinance, see n. 3, *supra*, makes it applicable only to rigidly assembled permanent signs. For that reason, the plurality is able to state that it deals only "with the law of billboards." *Ante*, at 501.

[8] The parties stipulated to the economic effects of the ordinance:

"If enforced as written, Ordinance No. 10795 will eliminate the outdoor advertising business in the City of San Diego.

.          .          .          .          .

"Plaintiffs' outdoor advertising displays produce substantial gross annual income.

.          .          .          .          .

"Enforcement of Ordinance No. 10795 will prevent plaintiffs from engaging in the outdoor advertising business in the City of San Diego and

now rent billboards to convey both commercial and noncommercial messages to the public will not have access to an equally effective means of communication.[9]   There is no evidence, however, that enforcement of the ordinance will have any effect whatsoever upon any property owner's use of onsite advertising signs.[10]   Nor is there anything in the record to suggest that the use of onsite signs has had any effect on the outdoor advertising business or on any of the consumers of offsite billboard space.

Appellants, of course, have standing to challenge the ordinance because of its impact on their own commercial operations.   Because this challenge is predicated in part on the First Amendment, I agree with the plurality and JUSTICE BRENNAN that they also have standing to argue that the ordinance is invalid because of its impact on their customers— the persons who use their billboards to communicate with the public.   See *ante,* at 504, n. 11 (plurality opinion).   I do not agree, however, that they have any standing to assert the purely hypothetical claims of property owners whose onsite advertising is entirely unaffected by the application of the ordinance at issue in this case.

---

will cause plaintiffs to suffer substantial monetary losses." Joint Stipulation of Facts Nos. 2, 26, 32, App. 42a, 48a, 49a.

[9] By stipulation, the parties agreed that the San Diego ordinance will limit the ability of some billboard users to communicate their messages to the public:

"Outdoor advertising increases the sales of products and produces numerous direct and indirect benefits to the public.   Valuable commercial, political and social information is communicated to the public through the use of outdoor advertising.   Many businesses and politicians and other persons rely upon outdoor advertising because other forms of advertising are insufficient, inappropriate and prohibitively expensive." Joint Stipulation of Facts No. 28, App. 48a.

[10] Nor is there any evidence that the total elimination of the outdoor advertising business will have any economic effect on manufacturers of onsite signs.   See JUSTICE BRENNAN's opinion concurring in the judgment, *ante,* at 526, n. 5.

This case involves only the use of permanent signs in areas zoned for commercial and industrial purposes.[11] It is conceivable that some public-spirited or eccentric businessman might want to use a permanent sign on his commercial property to display a noncommercial message. The record, however, discloses no such use in the past, and it seems safe to assume that such uses in the future will be at best infrequent. Rather than speculate about hypothetical cases that may be presented by property owners not now before the Court, I would judge this ordinance on the basis of its effect on the outdoor advertising market and save for another day any questions concerning its possible effect in an entirely separate market.

The few situations in which constitutional rights may be asserted vicariously represent exceptions from one of the Court's most fundamental principles of constitutional adjudication.[12] Our explanation of that principle in *Broadrick* v. *Oklahoma,* 413 U. S. 601, 610–611 (footnote omitted), merits emphasis and repetition:

> "Embedded in the traditional rules governing constitutional adjudication is the principle that a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others,

---

[11] Appellants each own between 500 and 800 outdoor advertising displays in San Diego. See Joint Stipulation of Facts No. 13, App. 44a. All of their signs are located in areas zoned for commercial and industrial uses. Joint Stipulation of Facts No. 20, App. 45a.

The California Supreme Court's narrowing construction of the ordinance was specifically intended to exclude from the coverage of the ordinance signs very different from commercial billboards, such as "a picket sign announcing a labor dispute or a small sign placed in one's front yard proclaiming a political or religious message." 26 Cal. 3d, at 856, n. 2, 610 P. 2d, at 410, n. 2.

[12] See, *e. g., McGowan* v. *Maryland,* 366 U. S. 420, 429: "[T]he general rule is that 'a litigant may only assert his own constitutional rights or immunities' . . . ."

in other situations not before the Court. See, *e. g., Austin* v. *The Aldermen,* 7 Wall. 694, 698–699 (1869); *Supervisors* v. *Stanley,* 105 U. S. 305, 311–315 (1882); *Hatch* v. *Reardon,* 204 U. S. 152, 160–161 (1907); *Yazoo & M. V. R. Co.* v. *Jackson Vinegar Co.,* 226 U. S. 217, 219–220 (1912); *United States* v. *Wurzbach,* [280 U. S.], at 399; *Carmichael* v. *Southern Coal & Coke Co.,* 301 U. S. 495, 513 (1937); *United States* v. *Raines,* 362 U. S. 17 (1960). A closely related principle is that constitutional rights are personal and may not be asserted vicariously. See *McGowan* v. *Maryland,* 366 U. S. 420, 429–430 (1961). These principles rest on more than the fussiness of judges. They reflect the conviction that under our constitutional system courts are not roving commissions assigned to pass judgment on the validity of the Nation's laws. See *Younger* v. *Harris,* 401 U. S. 37, 52 (1971). Constitutional judgments, as Mr. Chief Justice Marshall recognized, are justified only out of the necessity of adjudicating rights in particular cases between the litigants brought before the Court:

" 'So if a law be in opposition to the constitution; if both the law and the constitution apply to a particular case, so that the court must either decide that case conformably to the law, disregarding the constitution; or conformably to the constitution, disregarding the law; the court must determine which of these conflicting rules governs the case. This is of the very essence of judicial duty.' *Marbury* v. *Madison,* 1 Cranch 137, 178 (1803).

"In the past, the Court has recognized some limited exceptions to these principles, but only because of the most 'weighty countervailing policies.' *United States* v. *Raines,* 362 U. S., at 22–23."

The most important exception to this standing doctrine permits some litigants to challenge on First Amendment grounds laws that may validly be applied against them but

which may, because of their unnecessarily broad reach, inhibit the protected speech of third parties. That exception plays a vital role in our First Amendment jurisprudence.[13] But it is nonetheless a limited exception. Because "[a]pplication of the overbreadth doctrine . . . is, manifestly, strong medicine," it is employed "sparingly and only as a last resort." *Broadrick*, 413 U. S., at 613. As the Court explained in *Broadrick*, the doctrine will be applied only if the overbreadth of a statute is substantial in relation to its "plainly legitimate sweep":

> "Although such laws, if too broadly worded, may deter protected speech to some unknown extent, there comes a point where that effect—at best a prediction—cannot, with confidence, justify invalidating a statute on its face and so prohibiting a State from enforcing the statute against conduct that is admittedly within its power to proscribe. Cf. *Alderman* v. *United States,* 394 U. S. 165, 174–175 (1969). To put the matter another way, particularly where conduct and not merely speech is involved, we believe that the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep. It is our view that § 818 is not substantially overbroad and that whatever overbreadth may exist should be cured through case-by-case analysis of the fact situations to which its sanctions, assertedly, may not be applied." *Id.,* at 615–616 (footnote omitted).[14]

---

[13] See, *e. g., Dombrowski* v. *Pfister,* 380 U. S. 479; *Gooding* v. *Wilson,* 405 U. S. 518; *Keyishian* v. *Board of Regents,* 385 U. S. 589; *Shuttlesworth* v. *Birmingham,* 394 U. S. 147.

[14] Even the dissenting Justices in *Broadrick,* although they disagreed with the Court's refusal to apply the overbreadth doctrine in that case, acknowledged that an overbreadth challenge should not be entertained in every case raising First Amendment issues:

"We have never held that a statute should be held invalid on its face merely because it is possible to conceive of a single impermissible applica-

In my judgment, the likelihood that the San Diego ordinance will have a significant adverse impact on the users of onsite signs is sufficiently speculative and remote that I would not attempt to adjudicate the hypothetical claims of such parties on this record. Surely the interests of such parties do not necessarily parallel the interests of these appellants.[15] Moreover, changes in the provisions of the ordinance concerning onsite advertising would not avoid the central question that is presented by appellants' frontal attack on the application of the ordinance to their own businesses and to their customers.[16] I believe the Court should decide that question and put the hypothetical claims of onsite advertisers entirely to one side.

## II

Just as the regulation of an economic market may either enhance or curtail the free exchange of goods and services,[17] so may regulation of the communications market sometimes facilitate and sometimes inhibit the exchange of information, ideas, and impressions. Procedural rules in a deliberative body are designed to improve the quality of debate. Our

---

tion, and in that sense a requirement of substantial overbreadth is already implicit in the doctrine." 413 U. S., at 630 (BRENNAN, J., joined by STEWART and MARSHALL, JJ., dissenting).

[15] Indeed, the parties stipulated that onsite advertising differs in significant respects from the outdoor advertising business in which appellants are engaged. See n. 5, *supra*.

[16] Ironically, today the plurality invalidates this ordinance—not because it is too broad—but rather because it is not broad enough. It assumes for the purpose of decision that a repeal of all exceptions, including the exception for onsite advertising, would cure the defects it finds in the present ordinance. See *ante*, at 515, n. 20. However, because neither the appellants nor the onsite advertisers would derive any benefits from a repeal of the exception for onsite commercial signs, the plurality's reliance on the overbreadth doctrine to support vicarious standing in this case is curious indeed.

[17] Compare *Chicago Board of Trade v. United States*, 246 U. S. 231, with *United States v. Trenton Potteries Co.*, 273 U. S. 392.

cases upholding regulation of the time, place, or manner of communication have been decided on the implicit assumption that the net effect of the regulation on free expression would not be adverse. In this case, however, that assumption cannot be indulged.

The parties have stipulated, correctly in my view,[18] that the net effect of the city's ban on billboards will be a reduction in the total quantity of communication in San Diego. If the ban is enforced, some present users of billboards will not be able to communicate in the future as effectively as they do now.[19] This ordinance cannot, therefore, be sustained on the assumption that the remaining channels of communication will be just as effective for all persons as a communications marketplace which includes a thousand or more large billboards available for hire.

The unequivocal language of the First Amendment prohibits any law "abridging the freedom of speech." That language could surely be read to foreclose any law reducing the quantity of communication within a jurisdiction. I am convinced, however, that such a reading would be incorrect. My conviction is supported by a hypothetical example, by the Court's prior cases, and by an appraisal of the healthy character of the communications market.

Archaeologists use the term "graffiti" to describe informal inscriptions on tombs and ancient monuments. The graffito was familiar in the culture of Egypt and Greece, in the Italian decorative art of the 15th century, and it survives today in some subways and on the walls of public buildings.[20] It is

---

[18] Because the record makes it clear that the business of operating billboards has prospered in San Diego, it is obvious that this medium is more effective than others for some forms of communication. See n. 8, supra.

[19] See nn. 8, 9, supra.

[20] See generally A. Read, Classic American Graffiti (1977); R. Reisner, Graffiti: Two Thousand Years of Wall Writing (1971); V. Pritchard, English Medieval Graffiti (1967).

an inexpensive means of communicating political, commercial, and frivolous messages to large numbers of people; some creators of graffiti have no effective alternative means of publicly expressing themselves. Nevertheless, I believe a community has the right to decide that its interests in protecting property from damaging trespasses and in securing beautiful surroundings outweigh the countervailing interest in uninhibited expression by means of words and pictures in public places. If the First Amendment categorically protected the marketplace of ideas from any quantitative restraint, a municipality could not outlaw graffiti.

Our prior decisions are not inconsistent with this proposition. Whether one interprets the Court's decision in *Kovacs* v. *Cooper,* 336 U. S. 77, as upholding a total ban on the use of sound trucks, or merely a ban on the "loud and raucous" use of amplifiers, the case at least stands for the proposition that a municipality may enforce a rule that curtails the effectiveness of a particular means of communication.[21] Even the dissenting Justices in that case thought it obvious that "cities may restrict or absolutely ban the use of amplifiers on busy streets in the business area." *Id.,* at 104 (Black, J., joined by Douglas and Rutledge, JJ., dissenting).[22] *Kovacs,* I be-

---

[21] In his opinion announcing the judgment of the Court, Justice Reed wrote:

"That more people may be more easily and cheaply reached by sound trucks, perhaps borrowed without cost from some zealous supporter, is not enough to call forth constitutional protection for what those charged with public welfare reasonably think is a nuisance when easy means of publicity are open." 336 U. S., at 88–89.

[22] That excerpt from Justice Black's dissent is not, of course, sufficient evidence to tell us whether or not he would have upheld a city's total ban on billboards. It does seem clear, however, that he did not adopt the absolute position that any reduction in the quantity of effective communication is categorically prohibited by the First Amendment. The full paragraph in which the quoted phrase appears reads:

"I am aware that the 'blare' of this new method of carrying ideas is susceptible of abuse and may under certain circumstances constitute an

lieve, forecloses any claim that a prohibition of billboards must fall simply because it has some limiting effect on the communications market.[23]

intolerable nuisance. But ordinances can be drawn which adequately protect a community from unreasonable use of public speaking devices without absolutely denying to the community's citizens all information that may be disseminated or received through this new avenue for trade in ideas. I would agree without reservation to the sentiment that 'unrestrained use throughout a municipality of all sound amplifying devices would be intolerable.' And of course cities may restrict or absolutely ban the use of amplifiers on busy streets in the business area. A city ordinance that reasonably restricts the volume of sound, or the hours during which an amplifier may be used, does not, in my mind, infringe the constitutionally protected area of free speech. It is because this ordinance does none of these things, but is instead an absolute prohibition of all uses of an amplifier on any of the streets of Trenton at any time that I must dissent." *Id.*, at 104.

[23] Our decisions invalidating ordinances prohibiting or regulating door-to-door solicitation and leafletting are not to the contrary. In those cases, the state interests the ordinances purported to serve—for instance, the prevention of littering or fraud—were only indirectly furthered by the regulation of communicative activity. See, *e. g., Schneider* v. *State,* 308 U. S. 147, 162, 164; *Martin* v. *City of Struthers,* 319 U. S. 141, 147–148; *Cantwell* v. *Connecticut,* 310 U. S. 296, 306; *Schaumburg* v. *Citizens for a Better Environment,* 444 U. S. 620, 636–639. In many of the cases, the ordinances provided for a licensing scheme, rather than a blanket prohibition. The discretion thus placed in the hands of municipal officials was found constitutionally offensive because of the risk of censorship. See, *e. g., Schneider, supra,* at 163–164; *Hague* v. *CIO,* 307 U. S. 496, 516 (opinion of Roberts, J.); *Lovell* v. *Griffin,* 303 U. S. 444, 451–452; *Cantwell, supra,* at 305–307. In addition, because many of these cases involved the solicitation efforts of the Jehovah's Witnesses, see, *e. g., Lovell, supra,* at 448; *Jamison* v. *Texas,* 318 U. S. 413, 413–414; *Schneider, supra,* at 158; *Martin, supra,* at 142; *Cantwell, supra,* at 300, the Court was properly sensitive to the risk that the ordinances could be used to suppress unpopular viewpoints.

In this case, as the plurality acknowledges, the ban on billboards directly serves, and indeed is necessary to further, the city's legitimate interests in traffic safety and aesthetics. See *ante,* at 507–510, 511. San Diego's ordinance places no discretion in any municipal officials, and there is no

I therefore assume that some total prohibitions may be permissible. It seems to be accepted by all that a zoning regulation excluding billboards from residential neighborhoods is justified by the interest in maintaining pleasant surroundings and enhancing property values. The same interests are at work in commercial and industrial zones. Reasonable men may assign different weights to the conflicting interests, but in constitutional terms I believe the essential inquiry is the same throughout the city. For whether the ban is limited to residential areas, to the entire city except its most unsightly sections, or is citywide, it unquestionably will limit the quantity of communication. Moreover, the interests served by the ban are equally legitimate and substantial in all parts of the city. Those interests are both psychological and economic. The character of the environment affects property values and the quality of life not only for the suburban resident but equally so for the individual who toils in a factory or invests his capital in industrial properties.

Because the legitimacy of the interests supporting a citywide zoning plan designed to improve the entire municipality are beyond dispute, in my judgment the constitutionality of the prohibition of outdoor advertising involves two separate questions. First, is there any reason to believe that the regulation is biased in favor of one point of view or another, or that it is a subtle method of regulating the controversial subjects that may be placed on the agenda for public debate? Second, is it fair to conclude that the market which remains open for the communication of both popular and unpopular ideas is ample and not threatened with gradually increasing restraints?

In this case, there is not even a hint of bias or censorship in the city's actions. Nor is there any reason to believe that the overall communications market in San Diego is inade-

---

reason to suspect that the ordinance was designed or is being applied to suppress unpopular viewpoints.

quate. Indeed, it may well be true in San Diego as in other metropolitan areas that the volume of communication is excessive and that the public is presented with too many words and pictures to recognize those that are most worthy of attention. In any event, I agree with THE CHIEF JUSTICE that nothing in this record suggests that the ordinance poses a threat to the interests protected by the First Amendment.

## III

If one is persuaded, as I am, that a wholly impartial total ban on billboards would be permissible,[24] it is difficult to understand why the exceptions in San Diego's ordinance present any additional threat to the interests protected by the First Amendment. The plurality suggests that, because the exceptions are based in part on the subject matter of non-commercial speech, the city somehow is choosing the permissible subjects for public debate. See *ante,* at 515. While this suggestion is consistent with some of the broad dictum in *Consolidated Edison Co.* v. *Public Service Comm'n,* 447 U. S. 530, it does not withstand analysis in this case.

The essential concern embodied in the First Amendment is that government not impose its viewpoint on the public or select the topics on which public debate is permissible. The San Diego ordinance simply does not implicate this concern. Although *Consolidated Edison* broadly identified regulations based on the subject matter of speech as impermissible content-based regulations, essential First Amendment concerns

---

[24] It seems fair to infer that Justice Douglas, who cast the deciding vote in *Lehman* v. *City of Shaker Heights,* 418 U. S. 298, would have approved of a prohibition on billboards. See his opinion concurring in the judgment, *id.,* at 306–308. After drawing an analogy between billboards and advertising on municipal vehicles, Justice Douglas noted:

"In my view the right of the commuters to be free from forced intrusions on their privacy precludes the city from transforming its vehicles of public transportation into forums for the dissemination of ideas upon this captive audience." *Id.,* at 307.

were implicated in that case because the government was attempting to limit discussion of controversial topics, see *id.,* at 533, and thus was shaping the agenda for public debate. The neutral exceptions in the San Diego ordinance do not present this danger.

To the extent that the exceptions relate to subject matter at all,[25] I can find no suggestion on the face of the ordinance that San Diego is attempting to influence public opinion or to limit public debate on particular issues. Except for the provision allowing signs to be used for political campaign purposes for limited periods, see § 101.0700 (F)(12), none of the exceptions even arguably relates to any controversial subject matter. As a whole they allow a greater dissemination of information than could occur under a total ban. Moreover, it was surely reasonable for the city to conclude that exceptions for clocks, thermometers, historic plaques, and the like, would have a lesser impact on the appearance of the city than the typical large billboards.

The exception for political campaign signs presents a different question. For I must assume that these signs may be

---

[25] Most of the ordinance's 12 exceptions, quoted *ante,* at 495, n. 3 (opinion of WHITE, J.), are not based on the subject matter of speech. Several exceptions can be disregarded because they pertain to signs that are not within the coverage of the ordinance at any rate, in light of the California Supreme Court's limiting construction. See n. 3, *supra.* The exceptions relating to vehicular signs fall into this category, see §§ 101.0700 (F)(9), (10), as do the exceptions for signs in transit and storage, see § 101.0700 (F)(3), and for temporary subdivision directional signs, see § 101.0700 (F)(11). The exception for "for sale" signs also appears to describe signs not covered by the ordinance since such signs ordinarily are not "permanently affixed to the ground or permanently attached to a building." Of the remaining exceptions, two are based on the location, rather than content, of the signs, see §§ 101.0700 (F)(2), (6), and a third permits signs required by law or otherwise erected in discharge of governmental functions, see § 101.0700 (F)(1). Thus, only four exceptions are actually based in any way on the subject matter of the signs at issue. See §§ 101.0700 (F)(4), (5), (8), (12).

just as unsightly and hazardous as other offsite billboards. Nevertheless, the fact that the community places a special value on allowing additional communication to occur during political campaigns is surely consistent with the interests the First Amendment was designed to protect. Of course, if there were reason to believe that billboards were especially useful to one political party or candidate, this exception would be suspect. But nothing of that sort is suggested by this record. In the aggregate, therefore, it seems to me that the exceptions in this ordinance cause it to have a less serious effect on the communications market than would a total ban.

In sum, I agree with THE CHIEF JUSTICE that nothing more than a rather doctrinaire application of broad statements that were made in other contexts may support a conclusion that this ordinance is unconstitutional because it includes a limited group of exceptions that neither separately nor in the aggregate compromise "our zealous adherence to the principle that the government may not tell the citizen what he may or may not say." *Young* v. *American Mini Theatres, Inc.*, 427 U. S. 50, 63 (opinion of STEVENS, J.). None of the exceptions is even arguably "conditioned upon the sovereign's agreement with what a speaker may intend to say." *Ibid.* Accordingly, and for the reasons stated in greater detail by THE CHIEF JUSTICE, I respectfully dissent.

CHIEF JUSTICE BURGER, dissenting.

Today the Court takes an extraordinary—even a bizarre— step by severely limiting the power of a city to act on risks it perceives to traffic safety and the environment posed by large, permanent billboards. Those joining the plurality opinion invalidate a city's effort to minimize these traffic hazards and eyesores simply because, in exercising rational legislative judgment, it has chosen to permit a narrow class of signs that serve special needs.

Relying on simplistic platitudes about content, subject matter, and the dearth of other means to communicate, the

billboard industry attempts to escape the real and growing problems every municipality faces in protecting safety and preserving the environment in an urban area. The Court's disposition of the serious issues involved exhibits insensitivity to the impact of these billboards on those who must live with them and the delicacy of the legislative judgments involved in regulating them. American cities desiring to mitigate the dangers mentioned must, as a matter of *federal constitutional law,* elect between two unsatisfactory options: (a) allowing all "noncommercial" signs, no matter how many, how dangerous, or how damaging to the environment; or (b) forbidding signs altogether. Indeed, lurking in the recesses of today's opinions is a not-so-veiled threat that the second option, too, may soon be withdrawn. This is the long arm and voracious appetite of federal power—this time judicial power—with a vengeance, reaching and absorbing traditional concepts of local authority.

### (1)

This case presents the Court with its first occasion to address the constitutionality of billboard regulation by local government. I fear that those joining in today's disposition have become mesmerized with broad, but not controlling, language appearing in our prior opinions but now torn from its original setting. They overlook a cogent admonition to avoid

> "mechanically apply[ing] the doctrines developed in other contexts. . . . The unique situation presented by this ordinance calls, as cases in this area so often do, for a careful inquiry into the competing concerns of the State and the interests protected by the guarantee of free expression." *Young* v. *American Mini Theatres, Inc.,* 427 U. S. 50, 76 (1976) (POWELL, J., concurring).

See *Columbia Broadcasting System, Inc.* v. *Democratic National Committee,* 412 U. S. 94, 134 (1973) (STEWART, J., concurring).

It is not really relevant whether the San Diego ordinance is viewed as a regulation regarding time, place, and manner, or as a total prohibition on a medium with some exceptions defined, in part, by content. Regardless of the label we give it, we are discussing a very simple and basic question: the authority of local government to protect its citizens' legitimate interests in traffic safety and the environment by eliminating distracting and ugly structures from its buildings and roadways, to define which billboards actually pose that danger, and to decide whether, in certain instances, the public's need for information outweighs the dangers perceived. The billboard industry's superficial sloganeering is no substitute for analysis, and the plurality opinion and the opinion concurring in the judgment adopt much of that approach uncritically. General constitutional principles indeed apply, but "each case ultimately must depend on its own specific facts . . . ." *Erznoznick* v. *City of Jacksonville,* 422 U. S. 205, 209 (1975).

### (2)

### (a)

As all those joining in today's disposition necessarily recognize, " '[e]ach medium of expression . . . must be assessed for First Amendment purposes by standards suited to it, for each may present its own problems.' " *Ante,* at 501, n. 8 (plurality opinion); *ante,* at 527–528 (BRENNAN, J., concurring in judgment) (quoting *Southeastern Promotions, Ltd.* v. *Conrad,* 420 U. S. 546, 557 (1975)). Accord, *California* v. *LaRue,* 409 U. S. 109, 117 (1972); *Red Lion Broadcasting Co.* v. *FCC,* 395 U. S. 367, 386 (1969); *Joseph Burstyn, Inc.* v. *Wilson,* 343 U. S. 495, 503 (1952); *Kovacs* v. *Cooper,* 336 U. S. 77, 97 (1949) (Jackson, J., concurring).[1] The uniqueness of

---

[1] For example, because of the limited spectrum available and the peculiar intrusiveness of the medium, broadcasting is subject to limitations that would be intolerable if applied to other forms of communication. *FCC* v. *Pacifica Foundation,* 438 U. S. 726, 748–749 (1978). Compare *Red Lion Broadcasting Co.* v. *FCC,* 395 U. S. 367 (1969), with *Miami Herald Pub-*

the medium, the availability of alternative means of communication, and the public interest the regulation serves are important factors to be weighed; and the balance very well may shift when attention is turned from one medium to another. *Heffron* v. *International Society for Krishna Consciousness, Inc.,* 452 U. S. 640 (1981). Regulating newspapers, for example, is vastly different from regulating billboards.

Some level of protection is generally afforded to the medium a speaker chooses, but as we have held just this past week in *Heffron,* "the First Amendment does not guarantee the right to communicate one's views at all times and places or *in any manner* that may be desired." *Id.,* at 647 (emphasis added). Justice Black, speaking for the Court in *Adderley* v. *Florida,* 385 U. S. 39, 48 (1966) (emphasis added), "vigorously and forthrightly rejected" the notion that "people who want to propagandize protests or views have a constitutional right to do so whenever and *however* and wherever they please."

In *Kovacs* v. *Cooper, supra,* the Court upheld a municipal ordinance that totally banned sound trucks from a town's borders; other media were available. The Court had no difficulty distinguishing *Saia* v. *New York,* 334 U. S. 558 (1948), decided seven months earlier, where the Court had invalidated an ordinance requiring a permit from the local police chief before using a sound truck. The danger seen in *Saia* was in allowing a single government official to regulate a medium of communication with the attendant risk that the decision would be based on the message, not the medium. *Id.,* at 560–561.

The ordinance in *Kovacs,* however, did not afford that kind of potential for censorship and was held not to violate the First Amendment. 336 U. S., at 82–83 (plurality opin-

---

*lishing Co.* v. *Tornillo,* 418 U. S. 241 (1974). For the same reason, certain media may mix the form with the substance of the communication and the permissible range of regulation is correspondingly narrower than when the message is completely separable from the medium used to convey it.

ion of Reed, J.). Justice Frankfurter, concurring, expressed this point more broadly:

"So long as a legislature does not prescribe what ideas may be noisily expressed and what may not be, nor discriminate among those who would make inroads upon the public peace, it is not for us to supervise the limits the legislature may impose in safeguarding the steadily narrowing opportunities for serenity and reflection." *Id.*, at 97.

Justice Jackson, also concurring separately, agreed with this core proposition, writing that the *Kovacs* type of regulation would not infringe freedoms of speech "unless such regulation or prohibition undertakes to censor the contents of the broadcasting." *Ibid.*

Later, Chief Justice Warren, speaking for the Court in *United States* v. *O'Brien,* 391 U. S. 367, 376 (1968), observed:

"[W]hen 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms."

In the 1979 Term, we once again reaffirmed that restrictions are valid if they "serve a significant governmental interest and leave ample alternative channels for communication." *Consolidated Edison Co.* v. *Public Service Comm'n,* 447 U. S. 530, 535 (1980). The Court has continued to apply this same standard almost literally to this day in *Heffron* v. *International Society for Krishna Consciousness, Inc., supra,* at 647–648. Accord, *Schad* v. *Mount Ephraim,* 452 U. S. 61, 75–76 (1981).

### (b)

San Diego adopted its ordinance to eradicate what it perceives—and what it has a right to perceive—as ugly and dangerous eyesores thrust upon its citizens. This was done

with two objectives in mind: the disfigurement of the surroundings and the elimination of the danger posed by these large, eye-catching signs that divert the attention of motorists.[2] The plurality acknowledges—as they must—that promoting traffic safety and preserving scenic beauty "are substantial governmental goals." *Ante,* at 507–508. See also *ante,* at 528 (BRENNAN, J., concurring in judgment) (traffic safety). But, having acknowledged the legitimacy of local governmental authority, the plurality largely ignores it.

As the plurality also recognizes, *ante,* at 508–510, the means the city has selected to advance these goals are sensible and do not exceed what is necessary to eradicate the dangers seen. When distraction of motorists is the perceived harm, the authorities reasonably can conclude that each billboard adds to the dangers in moving traffic; obviously, the billboard industry does not erect message carriers that do not catch the eye of the traveler.[3] In addition, a legislative body reasonably can conclude that every large billboard adversely

---

[2] Congress, too, has recognized the dangers to safety and the environment posed by billboards. The Highway Beautification Act of 1965 provides in part:

"The Congress hereby finds and declares that the erection and maintenance of outdoor advertising signs, displays, and devices in areas adjacent to the Interstate System and the primary system should be controlled in order to protect the public investment in such highways, *to promote the safety and recreational value of public travel, and to preserve natural beauty."* 23 U. S. C. § 131 (a) (emphasis added).

If San Diego, through its duly constituted legislative body, may not guard against the defacing of its environs and the risks to the movement of traffic by eliminating billboards, the authority of Congress to limit billboards adjacent to federally funded highways is called into question as well. See *ante,* at 515, n. 20 (plurality opinion); *ante,* at 534, n. 11 (BRENNAN, J., concurring in judgment). Surely, the legislative powers of a municipality over its own affairs cannot be less than those of the Congress of the United States in its area of authority.

[3] The parties have stipulated that billboards come in "two basic standardized forms," 12 ft. by 24 ft. and 14 ft. by 48 ft. Joint Stipulation of Facts No. 25, App. 47a.

affects the environment, for each destroys a unique perspective on the landscape and adds to the visual pollution of the city.[4] Pollution is not limited to the air we breathe and the water we drink; it can equally offend the eye and the ear.

The means chosen to effectuate legitimate governmental interests are not for this Court to select. "These are matters for the legislative judgment controlled by public opinion." *Kovacs v. Cooper,* 336 U. S., at 96–97 (Frankfurter, J., concurring). The plurality ignores this Court's seminal opinions in *Kovacs* by substituting its judgment for that of city officials and disallowing a ban on one offensive and intrusive means of communication when other means are available. Although we must ensure that any regulation of speech "further[s] a sufficiently substantial government interest," *Schad v. Mount Ephraim, supra,* at 68, given a reasonable approach to a perceived problem, this Court's duty is not to make the primary policy decisions but instead is to determine whether the legislative approach is essentially neutral to the messages conveyed and leaves open other adequate means of conveying those messages. This is the essence of both democracy and federalism, and we gravely damage both when we undertake to throttle legislative discretion and judgment at the "grass roots" of our system.

### (c)

· The plurality, in a remarkable *ipse dixit,* states that "[t]here can be no question that a prohibition on the erection of billboards infringes freedom of speech . . . ." *Ante,* at 520. Of course the city has restricted one form of communication, and this action implicates the First Amendment. But to say the ordinance presents a First Amendment *issue* is not necessarily to say that it constitutes a First Amendment *violation.*

---

[4] Indeed, streets themselves may be places of tranquility. *Heffron v. International Society for Krishna Consciousness, Inc.,* 452 U. S. 640, 651 (1981).

The plurality confuses the Amendment's coverage with the scope of its protection. See generally Schauer, Categories and the First Amendment: A Play in Three Acts, 34 Vand. L. Rev. 265, 270, 275–276 (1981).

In the process of eradicating the perceived harms, the ordinance here in no sense suppresses freedom of expression, either by discriminating among ideas or topics or by supressing discussion generally. San Diego has not attempted to suppress any particular point of view or any category of messages; it has not censored any information; it has not banned any thought. See *Police Dept. of Chicago* v. *Mosley,* 408 U. S. 92, 96 (1972). It has not "attempt[ed] to give one side of a debatable public question an advantage in expressing its view to the people . . . ." *First National Bank of Boston* v. *Bellotti,* 435 U. S. 765, 785 (1978) (footnote omitted). See *Madison School District* v. *Wisconsin Employment Relations Comm'n,* 429 U. S. 167, 175–176 (1976). There is no suggestion or danger that the city has permitted these narrow categories of signs but forbidden the vast majority "merely because public officials disapprove of the speaker's view." *Niemotko* v. *Maryland,* 340 U. S. 268, 282 (1951) (Frankfurter, J., concurring in result). Moreover, aside from a few narrow and essentially negligible exceptions, see *infra,* at 564– 565, 566, San Diego has not differentiated with regard to topic. See *Consolidated Edison Co.* v. *Public Service Comm'n,* 447 U. S., at 537–538; *Carey* v. *Brown,* 447 U. S. 455, 462, n. 6, 463 (1980); *First National Bank* v. *Bellotti, supra,* at 784– 785; *Police Dept. of Chicago* v. *Mosley, supra,* at 96. The city has not undertaken to determine, paternalistically, " 'what information is relevant to self-government.' " *Gertz* v. *Robert Welch, Inc.,* 418 U. S. 323, 339 (1974) (quoting *Rosenbloom* v. *Metromedia, Inc.,* 403 U. S. 29, 79 (1971) (MARSHALL, J., dissenting)).

The messages conveyed on San Diego billboards—whether commercial, political, social, or religious—are not inseparable from the billboards that carry them. These same mes-

sages can reach an equally large audience through a variety of other media: newspapers, television, radio, magazines, direct mail, pamphlets, etc. True, these other methods may not be so "eye-catching"—or so cheap—as billboards,[5] but there has been no suggestion that billboards heretofore have advanced any particular viewpoint or issue disproportionately to advertising generally. Thus, the ideas billboard advertisers have been presenting are not *relatively* disadvantaged vis-à-vis the messages of those who heretofore have chosen other methods of spreading their views. See *First National Bank* v. *Bellotti, supra,* at 789. See also *Martin* v. *Struthers,* 319 U. S. 141, 146 (1943). It borders on the frivolous to suggest that the San Diego ordinance infringes on freedom of expression, given the wide range of alternative means available.

(3)

(a)

The plurality concludes that a city may constitutionally exercise its police power by eliminating offsite *commercial* billboards; they reach this result by following our recent cases holding that commercial speech, while protected by the Constitution, receives less protection than "noncommercial"—*i. e.,* political, religious, social—speech. See, *e. g., Central Hudson Gas & Electric Corp.* v. *Public Service Comm'n,* 447 U. S. 557 (1980); *Ohralik* v. *Ohio State Bar Assn.,* 436 U. S. 447 (1978); *Bates* v. *State Bar of Arizona,* 433 U. S. 350 (1977). But as the plurality giveth, they also taketh away—and, in the process take away virtually everything.

---

[5] Before trial, the parties stipulated: "Many businesses and politicians and other persons rely upon outdoor advertising because other forms of advertising are insufficient, inappropriate and prohibitively expensive." Joint Stipulation of Facts No. 28, App. 48a. This sweeping, conclusory, and rather vague generalization does nothing to explain how other media are insufficient, inappropriate, or too expensive. More important, the stipulation does not suggest that any particular point of view or issue will be suppressed by the elimination of billboards.

In a bizarre twist of logic, the plurality seems to hold that *because* San Diego has recognized the hardships of its ordinance on certain special needs of citizens and, therefore, exempted a few narrowly defined classes of signs from the ordinance's scope—for example, onsite signs identifying places of business, time-and-temperature signs, commemorative and historic plaques—the ordinance violates the First Amendment. From these dubious premises, the plurality has given every city, town, and village in this country desiring to respond to the hazards posed by billboards a choice, as previously noted, between two equally unsatisfactory alternatives:

 (a) banning all signs of any kind whatsoever, or

 (b) permitting all "noncommercial" signs, no matter how numerous, how large, how damaging to the environment, or how dangerous to motorists and pedestrians.

Otherwise, the municipality must give up and do nothing in the face of an ever-increasing menace to the urban environment. Indeed, the plurality hints—and not too subtly—that the first option might be withdrawn if any city attempts to invoke it. See *ante,* at 515, n. 20. This result is insensitive to the needs of the modern urban dweller and devoid of valid constitutional foundations.

(b)

The exceptions San Diego has provided—the presence of which is the plurality's sole ground for invalidating the ordinance—are few in number, are narrowly tailored to peculiar public needs, and do not remotely endanger freedom of speech. Indeed, the plurality concludes that the distinctions among commercial signs are valid. *Ante,* at 512. More generally, as stated *supra,* at 562–563, San Diego has not preferred any viewpoint and, aside from these limited exceptions, has not allowed some subjects while forbidding others.

Where the ordinance does differentiate among topics, it simply allows such noncontroversial things as conventional

signs identifying a business enterprise, time-and-tempera-ture signs, historical markers, and for sale signs. It borders—if not trespasses—on the frivolous to suggest that, by allow-ing such signs but forbidding noncommercial billboards, the city has infringed freedom of speech. This ignores what we recognized in *Police Dept. of Chicago* v. *Mosley*, 408 U. S., at 98, that "there may be sufficient regulatory interests justi-fying selective exclusions or distinctions . . . ." For each ex-ception, the city is either acknowledging the unique connec-tion between the medium and the message conveyed, see, *e. g.*, *Linmark Associates, Inc.* v. *Willingboro*, 431 U. S. 85 (1977) (for sale signs), or promoting a legitimate public interest in information. Similarly, in each instance, the city reasonably could conclude that the balance between safety and aesthetic concerns on the one hand and the need to communicate on the other has tipped the opposite way.[6] More important, in no instance is the exempted topic controversial; there can be no rational debate over, for example, the time, the tempera-ture, the existence of an offer of sale, or the identity of a busi-ness establishment. The danger of San Diego's setting the agenda of public discussion is not simply *de minimis;* it is nonexistent. The plurality today trivializes genuine First Amendment values by hinging its holding on the city's deci-sion to allow some signs while preventing others that consti-tute the vast majority of the genre.

---

[6] Indeed, the plurality acknowledges that a city may undertake this kind of balancing:

"As we see it, the city could reasonably conclude that a commercial enter-prise—as well as the interested public—has a stronger interest in identify-ing its place of business and advertising the products or services available there than it has in using or leasing its available space for the purpose of advertising commercial enterprises located elsewhere." *Ante,* at 512.

A city reasonably may decide that onsite signs, by identifying the premises (even if in the process of advertising), actually promote traffic safety. Prohibiting them would require motorists to pay more attention to street numbers and less to traffic.

Thus, despite the plurality's unique focus, we are not confronted with an ordinance like the one in *Saia* v. *New York,* which vested in a single official—the local police chief—an unlimited discretion to grant or to deny licenses for sound trucks. "Annoyance at ideas can be cloaked in annoyance at sound. The power of censorship inherent in this type of ordinance reveals its vice." 334 U. S., at 562. Accord, *Shuttlesworth* v. *Birmingham,* 394 U. S. 147, 150–151 (1969); *Staub* v. *City of Baxley,* 355 U. S. 313, 322–325 (1958); *Lovell* v. *Griffin,* 303 U. S. 444, 451–452 (1938). See also *Consolidated Edison Co.* v. *Public Service Comm'n,* 447 U. S., at 546–548 (STEVENS, J., concurring in judgment). But here we have no allegation and no danger that San Diego is using its billboard ordinance as a mask for promoting or deterring any viewpoint or issue of public debate. This ordinance, in precisely the same sense as the regulation we upheld last week in *Heffron* v. *International Society for Krishna Consciousness, Inc.,* "is not open to the kind of arbitrary application that this Court has condemned . . . because such discretion has the potential for becoming a means of suppressing a particular point of view." 452 U. S., at 649.[7]

San Diego simply is exercising its police power to provide an environment of tranquility, safety, and as much residual beauty as a modern metropolitan area can achieve. A city's simultaneous recognition of the need for certain exceptions permitting limited forms of communication, purely factual in nature and neutral as to the speaker, should not wholly deprive the city of its ability to address the balance of the problem. There is no threat here to our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open . . . ." *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 270 (1964).

---

[7] As JUSTICE BRENNAN recognizes, *ante,* at 536–540, the plurality's treatment of the ordinance may well create this very danger, for the plurality appears willing to allow municipal officials to determine what is and is not noncommercial speech.

## (c)

The fatal flaw in the plurality's logic comes when it concludes that San Diego, by exempting onsite commercial signs, thereby has "afford[ed] a greater degree of protection to commercial than to noncommercial speech." *Ante,* at 513. The "greater degree of protection" our cases have given noncommercial speech establishes a narrower range of constitutionally permissible regulation. To say noncommercial speech receives a greater degree of *constitutional* protection, however, does not mean that a legislature is forbidden to afford differing degrees of *statutory* protection when the restrictions on each form of speech—commercial and noncommercial—otherwise pass constitutional muster under the standards respectively applicable.

No case in this Court creates, as the plurality suggests, a hierarchy of types of speech in which, if one type is actually protected through legislative judgment, the Constitution compels that that judgment be exercised in favor of all types ranking higher on the list. When a city chooses to impose looser restrictions in one area than it does in another analogous area—even one in which the Constitution more narrowly constrains legislative discretion—it neither undermines the constitutionality of its regulatory scheme nor renders its legislative choices *ipso facto* irrational. A city does not thereby "conced[e] that some communicative interests . . . are stronger than its competing interests in esthetics and traffic safety," *ante,* at 520; it has only declined, in one area, to exercise its powers to the full extent the Constitution permits. The Constitution does not require any governmental entity to reach the limit of permissible regulation solely because it has chosen to do so in a related area. Cf. *Williamson* v. *Lee Optical Co.,* 348 U. S. 483, 489 (1955) (a "legislature may select one phase of one field and apply a remedy there, neglecting the others"). The plurality today confuses the degree of constitutional protection—*i. e.,* the strictness of the test applied—with the outcome of legislative judgment.

568

By allowing communication of certain commercial ideas via billboards, but forbidding noncommercial signs altogether, a city does not necessarily place a greater "value" on commercial speech.[8] In these situations, the city is simply recognizing that it has greater latitude to distinguish among various forms of commercial communication when the same distinctions would be impermissible if undertaken with regard to noncommercial speech. Indeed, when adequate alternative channels of communication are readily available so that the message may be freely conveyed through other means, a city arguably is more faithful to the Constitution by treating all noncommercial speech the same than by attempting to impose the same classifications in noncommercial as it has in commercial areas. To undertake the same kind of balancing and content judgment with noncommercial speech that is permitted with commercial speech is far more likely to run afoul of the First Amendment.[9]

Thus, we may, consistent with the First Amendment, hold that a city may—and perhaps must—take an all-or-nothing approach with noncommercial speech yet remain free to adopt selective exceptions for commercial speech, as long as the latter advance legitimate governmental interests. In-

---

[8] Indeed, in *Lehman* v. *City of Shaker Heights,* 418 U. S. 298 (1974), we upheld a municipal policy allowing commercial but not political advertising on city buses. I cannot agree with the plurality that *Lehman* "ha[s] no application here." *Ante,* at 514, n. 19. Although *Lehman* dealt with limited space leased by the city and this case deals with municipal regulation of privately leased space, the constitutional principle is the same: a city may forgo the "lurking doubts about favoritism" in granting space to some, but necessarily not all, political advertisers. 418 U. S., at 304 (plurality opinion of BLACKMUN, J.). The same constitutional dangers do not arise in allocating space among commercial advertisers.

[9] See n. 8, *supra.* If a city were to permit onsite noncommercial billboards, one can imagine a challenge based on the argument that this favors the views of persons who can afford to own property in commercial districts. See *supra,* at 562–563. I intimate no view on whether I would accept such an argument should that case ever arise.

deed, it is precisely *because* "the city does not have the same range of choice in the area of noncommercial speech to evaluate the strength of, or distinguish between, various communicative interests," *ante,* at 514, that a city should be commended, not condemned, for treating all noncommercial speech the same.

(4)

The Court today unleashes a novel principle, unnecessary and, indeed, alien to First Amendment doctrine announced in our earlier cases. As JUSTICE STEVENS cogently observes, the plurality, "somewhat ironically, concludes that the ordinance is an unconstitutional abridgment of speech *because it does not abridge enough speech." Ante,* at 540 (emphasis added). The plurality gravely misconstrues the commercial-noncommercial distinction of earlier cases when it holds that the preferred position of noncommercial speech compels a city to impose the same or greater limits on commercial as on noncommercial speech. The Court today leaves the modern metropolis with a series of Hobson's choices and rejects basic concepts of federalism by denying to every community the important powers reserved to the people and the States by the Constitution. This is indeed "an exercise of raw judicial power," *Doe* v. *Bolton,* 410 U. S. 179, 222 (1973) (WHITE, J., dissenting), and is far removed from the high purposes of the First Amendment.

JUSTICE REHNQUIST, dissenting.

I agree substantially with the views expressed in the dissenting opinions of THE CHIEF JUSTICE and JUSTICE STEVENS and make only these two additional observations: (1) In a case where city planning commissions and zoning boards must regularly confront constitutional claims of this sort, it is a genuine misfortune to have the Court's treatment of the subject be a virtual Tower of Babel, from which no definitive principles can be clearly drawn; and (2) I regret even more

keenly my contribution to this judicial clangor, but find that none of the views expressed in the other opinions written in the case come close enough to mine to warrant the necessary compromise to obtain a Court opinion.

In my view, the aesthetic justification alone is sufficient to sustain a total prohibition of billboards within a community, see *Berman* v. *Parker,* 348 U. S. 26, 32–33 (1954), regardless of whether the particular community is "a historical community such as Williamsburg" or one as unsightly as the older parts of many of our major metropolitan areas. Such areas should not be prevented from taking steps to correct, as best they may, mistakes of their predecessors. Nor do I believe that the limited exceptions contained in the San Diego ordinance are the types which render this statute unconstitutional. The closest one is the exception permitting billboards during political campaigns, but I would treat this as a virtually self-limiting exception which will have an effect on the aesthetics of the city only during the periods immediately prior to a campaign. As such, it seems to me a reasonable outlet, limited as to time, for the free expression which the First and Fourteenth Amendments were designed to protect.

Unlike JUSTICE BRENNAN, I do not think a city should be put to the task of convincing a local judge that the elimination of billboards would have more than a negligible impact on aesthetics. Nothing in my experience on the bench has led me to believe that a judge is in any better position than a city or county commission to make decisions in an area such as aesthetics. Therefore, little can be gained in the area of constitutional law, and much lost in the process of democratic decisionmaking, by allowing individual judges in city after city to second-guess such legislative or administrative determinations.